In re ESTATE OF Alice
G. NOVOSIELSKI,
Deceased.

**Appeal of Thomas V. Proch.**

Superior Court of Pennsylvania.

Argued Aug. 21, 2007.
Filed Sept. 25, 2007.
Reargument Denied Dec. 4, 2007.

Theodore F. Huckestein, Jr., Pittsburgh, for appellant

John A. Modzelewski, Pennington, NJ, for appellee.

BEFORE: GANTMAN, TAMILIA and POPOVICH, JJ.

OPINION BY TAMILIA, J.:

¶ 1 Thomas V. Proch appeals from the January 8, 2007, Decree ordering him, *inter alia*, to inventory, within the Novosielski estate, the principal and proceeds of a treasury account titled in his and decedent Alice G. Novosielski's names.

¶ 2 On June 12, 1995, decedent duly executed a last will and testament bequeathing her substantial estate, in the event her husband predeceased her, *per stirpes* to two living siblings and the children of three other predeceased siblings. Record, No. 62, Objectors' Exhibits, Exb. H. At some point within the next few years, decedent began to experience health problems and required increased assistance in accomplishing every day tasks.

¶ 3 On August 25, 2000, decedent granted appellant a power-of-attorney. Immediately, appellant undertook a consolidation of decedent's assets. N.T., Master's Hearing Vol. 1, 11/14/05, at 70. This consolidation entailed transferring the assets held in a number of accounts to a single account with National City Bank of Pennsylvania. *Id.* at 70–71. Once the consolidation was complete, appellant began to explore various methods of investing the assets in the consolidated account. *Id.* at 72.

¶ 4 On September 15, 2000, decedent executed a codicil to her 1995 will. The codicil named appellant as the executor of her estate; provided for two $5,000 bequests—with appellant the named beneficiary of one of these bequests; and ratified and republished her 1995 will "in all other respects." Record, No. 63, Respondent's Exhibits, Exb. 5, First Codicil. Four days later, on September 19, 2000, the decedent executed a Treasury Bill, Note & Bond Tender (tender). Record, No. 62, Objectors' Exhibits, Exb. L. The tender was executed during a meeting between decedent and appellant with no other relatives or parties present and it was drafted by appellant. N.T., Master's Hearings, Vol. 2, 11/15/05, at 300. The tender was signed by the decedent and dated by appellant. N.T., Master's Hearing Vol. 1, at 77.

¶ 5 The tender authorized the issuance of a one-time $500,000 payment from the decedent's National City Bank account to be used for the purchase of a 13–week treasury bill that was to be held on account with a Federal Reserve Bank. Record, No. 62, Objectors' Exhibits, Exb. L. The tender further authorized three 13–week automatic subsequent and sequential reinvestments. *Id.* At the end of the investment period, or any extension thereof, the principal and interest from the treasury account were to be transferred back into decedent's National City Bank account. *Id.* More importantly, the tender provided that the treasury account be titled under the appellation "Alice G. Novosielski or Thomas V. Proch." *Id.* The tender did not specifically provide appellant with a right of survivorship in the event decedent predeceased him while the account was still open. *Id.*

¶ 6 At the expiration of the first four 13–week investment periods, appellant unilaterally decided to authorize a subsequent one-year reinvestment of the treasury account holdings without consulting decedent. N.T., Master's Hearing Vol. 2, at 302. On November 16, 2001, the decedent died at the age of 79, just weeks after appellant authorized the reinvestment.

¶ 7 On December 11, 2002, appellant, acting in his role as executor, filed a first and final account of the decedent's estate excluding the treasury account from the estate. Record, No. 10. Helen Modzelski, a/k/a Helen Modzelewski, decedent's sister, filed objections to the accounting arguing appellant did not own the treasury account simply by virtue of being listed as

a co-owner on the tender at the time of decedent's death and, therefore, the treasury account should be inventoried with the estate. Record, No. 11.

¶ 8 On October 8, 2003, appellant filed an amended first and final account. In response, John Modzelewski—the son of Helen, who met an untimely demise shortly after issuing her initial objection—filed a second set of objections alleging appellant had abused his role as decedent's attorney-in-fact by misappropriating and/or misusing approximately $90,000 of the decedent's funds. Record, No. 30.

¶ 9 A special master was appointed and hearings were held from November 14, 2005, until November 16, 2005, with a later hearing being held on December 7, 2005. On July 7, 2006, the master issued his report wherein he concluded, in relevant part, appellant owned the treasury account. The master also concluded appellant had breached his fiduciary duty as decedent's attorney-in-fact and, as a consequence, recommended a surcharge of $96,059. On July 17, 2006, Mr. Modzelewski filed exceptions arguing the master had erred in awarding appellant ownership of the treasury account. Record, No. 41. The orphans' court agreed and issued the Order subject of this appeal.

¶ 10 Appellant raises a single issue for our consideration: "Did the lower court err in awarding the Treasury Direct Account in the amount of $500,000.00, titled in the names of Alice G. Novosielski or Thomas V. Proch to the estate of Alice G. Novosielski?" Appellant's brief at 3.

¶ 11 Our standard of review over a final Order from the orphans' court requires a determination as to whether an error of law, abuse of discretion, or a

capricious disregard of competent evidence has occurred. *In re Estate of Ciaffoni,* 787 A.2d 971, 973 (Pa.Super.2001), *citing In re Benson,* 419 Pa.Super. 582, 615 A.2d 792, 793 (1992). In applying this standard, our scope of review is limited in that we must accord the factual findings of the orphans' court, sitting without a jury, the same weight and effect as we would a jury verdict. We will not disturb the court's findings absent manifest error. *Id.*

## I. Characterizing the Treasury Account

¶ 12 As is often the case when the juxtaposition of family and money converge at the heart of a dispute, the parties in this case have little in the way of common ground. The parties' lengthy briefs both push for an intensive factual review of the case by this Court and there is significant disagreement on how the transactional structure of the treasury account initially should be characterized.

¶ 13 Appellant contends the treasury account is a "joint account" and, as such, distribution of the account is governed by the Multiple–Party Accounts Act (MPAA). *See* 20 Pa.C.S.A. §§ 6301–6306. According to appellant's characterization, the following provision of the MPAA controls:

(a) JOINT ACCOUNT.—Any sum remaining on deposit at the death of a party to a joint account belongs to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intent at the time the account is created.

20 Pa.C.S.A. § 6304, **Right of survivorship,** (a) **Joint account.**[1]

---

1. Mr. Modzelewski contends the treasury account should be analyzed as an *inter vivos* gift. He further contends appellant failed to

produce the clear and convincing evidence necessary to prove the treasury account was an *inter vivos* gift. *Id.* at 28, *citing Hera v.*

¶ 14 The MPAA defines an "account" as "a contract of deposit of funds between a depositor and a financial institution, and includes a checking account, saving account, certificate of deposit, share account and other like arrangements." 20 Pa. C.S.A. § 6301, **Definitions.** The MPAA defines "joint account," in turn, as "an account payable on request to one or more of two or more parties whether or not mention is made of any right of survivorship." *Id.*

¶ 15 There is no dispute decedent was a "depositor" for purposes of the MPAA definition of "account." The parties also do not dispute that the Federal Reserve Bank responsible for administering decedent's treasury account is a "financial institution" for purposes of section 6301. *See also*

*Deutsch, Larrimore & Farnish, P.C.,* 577 Pa. 637, 848 A.2d 137, 146 (2004) (Cappy, C.J. dissenting) (noting that for purposes of the MPAA, the phrase "financial institution" unquestionably encompasses all banks and financial institutions). While it is apparent the treasury account subject to our review is not one of the enumerated transactional structures in section 6301, it is yet to be determined whether the treasury account is an "other like arrangement." There are very few reported cases wherein a court of this Commonwealth, or any other court for that matter, has considered whether a certain transactional structure is an "other like arrangement" for purposes of section 6301.

¶ 16 In *Deutsch, Larrimore & Farnish, P.C., supra,* a fractured Supreme Court

*McCormick,* 425 Pa.Super. 432, 625 A.2d 682, 686 (1993). The trial court sidestepped the issue by stating that "Whether this type of account is governed by the Multiple–Party Accounts Act, ("MPAA"), 20 Pa.C.S.A. §§ 6301–6306, or is analyzed under the requirements to establish an *inter vivos* gift of the monies in the account, the conclusion is the same." Trial Court Opinion at 4.

This treatment was employed to reach a practical resolution. Nonetheless, we believe this treatment, if sanctioned, could add silt to already murky water. *See Deutsch, Larrimore & Farnish, P.C. v. Johnson,* 577 Pa. 637, 848 A.2d 137, 140 (noting the MPAA employs a testamentary rationale), *accord* 20 Pa.C.S.A. § 6304, **Right of survivorship,** (a) **Joint account,** Jt. St. Govt. Comm. Comment; *see also In re Estate of Eastman,* 760 A.2d 16, 19 (Pa.Super.2000), *quoting* 20 Pa.C.S.A. § 6303, **Ownership during lifetime,** (a) **Joint account,** Jt. St. Govt. Comm. Comment.

There is no indication within the certified record that decedent intended appellant to be the recipient of the treasury account during her lifetime. *See e.g., N.T.,* Master's Hearing Vol. 2, at 296 ("She says when I die, the remainder of this is going to be yours."). The intent to create an *inter vivos* gift is not at issue in this case. Analyzing the treasury account as an *inter vivos* gift, therefore, requires reliance on an unnecessary legal fic-

tion. If we conclude the treasury account is not an MPAA "account" then the tender simply fails as a testamentary document because the tender contained no bequests and no expression of the intent to provide for a testamentary distribution. *See generally,* **Black's Law Dictionary** 1628 (8th ed. 2004).

When the intent to create an *inter vivos* gift is not directly at issue in an MPAA joint account case, applying the *inter vivos* gift analysis can lead to confusion as to who carries the burden of production and as to what evidence is relevant in carrying the burden. When a litigant argues that a decedent intended a joint account as an *inter vivos* gift to the litigant, the orphans' court should analyze the account as an *inter vivos* gift and disregard the MPAA ownership presumption. *See* 20 Pa.C.S.A. § 6303, (a) Jt. St. Govt. Comm. Comment, *supra.* The litigant will be required to produce clear and convincing evidence of both donative intent and delivery. *Hera, supra* at 686. If, however, a litigant argues the MPAA ownership presumption applies, there is no reason to analyze the account as an *inter vivos* gift. In these instances, the challenger will have to produce clear and convincing evidence of a "different intent" to prevail. 20 Pa.C.S.A. § 6304(a). Obviously, if a litigant advocates both an *inter vivos* gift and the MPAA ownership presumption, his position will rest on logically incoherent ground.

analyzed the question of whether a Morgan Stanley/Dean Witter brokerage account was an "other like arrangement."[2] While the Justices disagreed on various aspects of the case, two approaches emerged for analyzing such questions.

¶ 17 The first, advanced by Madame Justice Newman in the plurality Opinion, focuses on the transactional structure at issue in order to determine whether the depositor deposited funds with a financial institution with the expectation that the funds would generate some future yield. *Id.* at 141. In advancing this approach, Madame Justice Newman delineated a distinction in the case law between the transfer of the ownership of an asset directly to the depositor and the receipt of an ownership interest in an account or other entity holding a specific asset on the depositor's behalf. *Id.*, *quoting Balazick v. Ireton*, 518 Pa. 127 n. 1, 541 A.2d 1130 n. 1 (1988) ("Ownership of the securities is not transferred to the customer, and the bank does not create a deposit contract," but "issues a receipt indicating the ownership of the interest [that] has been created …"). The second approach, set forth in Justice Saylor's concurring Opinion, focused on looking to whether the Morgan Stanley/Dean Witter brokerage account shared "characteristics generally associated" with some of the traditional transactional structures enumerated in section 6301. *Id.* at 144 (Saylor, J. concurring).

¶ 18 Application of both analytical approaches yields the same result in this case—decedent's treasury account is, indeed, an "account" for purposes of the MPAA. The documentation from Treasury Direct contained in the certified record references decedent's interest as an account and statements submitted by the service to decedent detail the account "holdings." *See e.g.*, Record, No. 62, Objector's Exhibits, Exb. M, Statement of Account; *accord, id.* at Exb. II, Treasury Direct Investor Kit, at 5 ("Here's how it all works. When you buy your first Treasury security through Treasury Direct, we'll create an Investor Account in your name. It's a single account to hold all your marketable Treasury securities."). A depositor deciding whether to employ the treasury account transactional structure would have the expectation that the treasury account is what it purports to be. *See* foot-

---

2. Mr. Modzelewski contends that if we conclude the treasury account is an MPAA "account" we would be authorizing "an unprecedented state extension into the federal arena." Appellee's brief at 34. In support of this contention, he points to *Union National Bank of Texas v. Ornelas–Gutierrez*, 772 F.Supp. 962 (S.D.Tex.1991).

The plurality in *Deutsch, Larrimore & Farnish, P.C. v. Johnson*, 577 Pa. 637, 848 A.2d 137 (2004) cited *Ornelas–Gutierrez* and paraphrased the district court's holding—namely, the "finding that the investment by UNB in book-entry United States Treasury bills on behalf of a depositor was not an 'account' as defined by the Texas Probate Code, but rather was a brokerage-custodial agreement between UNB and the depositor." *Id.* at 141. The Court, in the next breath, goes on to state: "While a brokerage account is not one of the enumerated services of a financial institution

in that it is not a checking or savings account, we believe that a brokerage account is encompassed within the purview of 'share accounts, and other like arrangements.' " *Deutsch, Larrimore, supra* at 141.

We believe our Supreme Court aptly recognized that in analyzing whether a transactional structure is an "other like arrangement" for purposes of the MPAA, the depositor's viewpoint and expectations of the transactional structure, and not the viewpoint of the financial institution, should be paramount given the rationale underlying the MPAA. *See contra Ornelas–Gutierrez, supra* at 966 (concluding that since banks typically list deposits on their balance sheets as assets and, that since UNB could not list treasury bills as assets pursuant to internal bank regulations, treasury accounts could not be "MPAA" accounts).

note # 2, *supra citing Deutsch, Larrimore & Farnish, P.C., supra* at 141.

¶ 19 Moreover, the enumerated transactional structures in section 6301 and the Morgan Stanley/Dean Witter brokerage account at issue in *Deutsch, Larrimore & Farnish, P.C.* share a common pattern. The depositor deposits funds with another entity. The entity invests or loans the funds. The investment or loan to which the funds are directed does not become the personal property, in of itself, of the depositor even though the depositor is, or could be, aware of the nature and characteristics of the investment or loan. The investment or loan generates a yield or interest. The principal and the yield or interest are returned either upon the depositor's demand or on a predetermined maturity date.

¶ 20 Unquestionably, decedent's treasury account fits this pattern. Decedent transferred $500,000 to the Treasury Direct service. Treasury Direct invested the funds in a United States Treasury Bill, which was held on account with a Federal Reserve Bank. The Treasury Bill itself was never delivered or titled in decedent's name, although she was aware of the Bill. The Bill generated interest income. The Bill was then liquidated and the principal and interest yield were returned.

¶ 21 There is no question the treasury account also fits the MPAA definition of "joint account." The Treasury Direct Investor Kit, a pamphlet issued by the Treasury Direct service that provides information for prospective investors, notes that the service will sell securities held in a treasury account on demand and deposit the proceeds of any sale in an account designated by a depositor. Record, No. 62, Objector's Exhibits, Exb. II, at 17, *accord* Record, No. 63, Objector's Exhibits, Exb. 7, at 25; *see also* 20 Pa.C.S.A. § 6301 (defining "joint account" as "an account payable on request to one or more of two or more parties whether or not mention is made of any right of survivorship"). By virtue of the account being titled with the designation "Alice G. Novosielski or Thomas V. Proch," a title that employs the connective "or," both decedent and appellant had the authority to authorize transactions with the account pursuant to the terms of the kit. *Id.* at Exb. II, at 5, *accord id.* at Exb. 7, at 6; *see also* 20 Pa.C.S.A. § 6301.

¶ 22 Accordingly, we find decedent's treasury account to be an "account" and, more specifically, a "joint account" for purposes of section 6304(a). We must start with the presumption that the funds in the treasury account belong to appellant. 20 Pa.C.S.A. § 6304(a), Jt. St. Govt. Comm. Comment ("The underlying assumption is that most persons who use joint accounts want the survivor or survivors to have all balances remaining at death."). We now turn to the question of whether Mr. Modzelewski was able to provide clear and convincing evidence showing decedent had a different testamentary intent when the tender was executed. 20 Pa.C.S.A. § 6304(a).

## II. Intent

¶ 23 Appellant alleges the orphans' court exceeded its authority in concluding decedent did not intend appellant to own the treasury account when it was created by disregarding binding credibility determinations made by the master. Appellant's brief at 9–10, *citing In re Sweeney,* 695 A.2d 426, 428 (Pa.Super.1997).

¶ 24 We decline the opportunity to delineate the scope of the deference an orphans' court must give the credibility determinations contained within a master's report. *Cf. In re Sweeney, supra* at 429 ("Upon his review, the trial court had the power to accept or reject the master's

report and recommendations in whole or in part; he could have remanded to supplement the record or for consideration of issues not fully considered by the master; he could have held hearings to supplement the findings of the master, as he could have permitted oral arguments and submission of briefs, all before he entered the final Order."). Suffice it to say, it is apparent the master did not rely upon appellant's credibility in rendering its initial report given the master's corresponding finding that appellant breached his fiduciary duties as decedent's attorney-in-fact in effectuating no less than nine unauthorized transactions. Record, No. 39, Master's Report, Conclusions of Law, at 6–7, ¶¶ 3–8. Indeed, the master did not make an explicit finding that appellant was a credible witness. *Id.,* Findings of Fact, at 1–6.

¶ 25 Rather, the master's report makes it clear he relied on other evidence in concluding decedent intended ownership of the treasury account be transferred to appellant upon her demise. The master pointed out that decedent had executed a will in 1976, subsequently revoked, wherein she evinced the intent to bequeath half of her estate to appellant's mother in the event decedent predeceased her, and that she drafted an unexecuted will in 1995, wherein she evinced an intent to bequeath her entire estate to appellant's mother in the event decedent predeceased her. Record, No. 39, Master's Report, Discussion, Treasury Direct Account, at 13.

■ ¶ 26 The master's reliance on the 1976 revoked will and the 1995 unexecuted will to bolster his conclusion that decedent intended appellant to own the treasury account was erroneous. The master's reliance derived from an attempt to demon-strate the decedent intended appellant to have the treasury account upon her death. After it is determined that an MPAA account is at issue, however, a section 6304(a) analysis should not be focused on reinforcing the ownership presumption by establishing whether or not the decedent was able to form the intent, or did so intend, to create a testamentary distribution in creating an MPAA joint account. *See* 20 Pa.C.S.A. § 6304(a); *see also* footnote 1, *supra.* Testamentary intent is assumed by operation of statute. *Id.* We suspect this misplaced focus led to the master's reliance on the 1976 revoked will and the 1995 unexecuted will, both of which are inoperative expressions of the decedent's intent as a matter of law. To the contrary, the master was to look for clear and convincing evidence of a "different intent" at the time the account was created that would result in a disposition that would differ from the distribution that would occur if the section 6304(a) ownership presumption were to be applied. *Id.* Such clear and convincing evidence exists in the certified record of this case:

¶ 27 In June of 1995, decedent duly executed a last will and testament bequeathing her estate, in the event her husband predeceased her, *per stirpes* to two living siblings and the children of three other predeceased siblings. Record, No. 62, Objectors' Exhibits, Exb. H. This will was republished on September 15, 2000, when appellant executed a codicil. Record, No. 63, Respondent's Exhibits, Exb. 5, First Codicil. The treasury account was not mentioned in the codicil, even though the tender was executed within four days of the codicil being executed. *Id.* No evidence was offered indicating this will was revoked.[3] Upon decedent's death, the

---

**3.** The Wills Act makes it clear that the execution of the tender, in of itself, would be insuf-ficient to revoke decedent's validly executed will:

1995 will and 2000 codicil were effective as expressions of the testator's intent by operation of law. The will left approximately one-tenth (1/10) of the decedent's estate to appellant, which is a far lesser share than the approximate four-fifths (4/5) share appellant would receive if he were found to be the owner of the treasury account. Record, No. 62, Objectors' Exhibits, Exb. H.

■ ¶ 28 When the execution of a valid will pre-dates the creation of a challenged MPAA joint account, we must consider whether the intentions expressed in the will can be read in a manner that is consistent with the decision to place assets in the MPAA joint account. If we cannot find such consistency the expression of intent in the will must control unless we determine that the creation of the joint account functions as a revocation of the validly executed will.[4] *See* 1 Pa.C.S.A. § 1932(a), **Statutes in *pari materia;*** *see also* 20 Pa.C.S.A. § 2505, **Revocation of a will.**

¶ 29 In this instance, the distribution scheme contemplated in decedent's will and codicil varies drastically from the distribution which would occur if the section 6304(a) ownership presumption were to be applied. We find no consistency between the intent expressed by decedent's will and codicil and the decision to create the treasury account. To apply the ownership presumption would be, for all practical purposes, to use section 6304(a) to revoke the prior will in a manner not contemplated by our statutory scheme. *See* 20 Pa.

C.S.A. § 2505. By giving effect to the plain language of section 6304(a) requiring clear and convincing evidence of a different intent to be produced, we are able to read section 6304(a) in a manner consistent with the language and objectives of the Wills Act. *See generally,* 1 Pa.C.S.A. § 1903(a), **Words and Phrases;** 1 Pa. C.S.A. § 1921, **Legislative intent controls;** 1 Pa.C.S.A. § 1932(a). We must give effect to the will. To conclude otherwise would lead to the frustration of testamentary intent and could result in fraud. Decedent's 1995 will and the 2000 codicil are precisely the form of clear and convincing evidence section 6304(a) contemplates a challenger must produce in defeating the presumption of ownership of a joint account. By its very nature, a validly executed will is the clearest and most convincing evidence of a decedent's intent that can be produced.

¶ 30 This case serves as a graphic illustration of the problems that could arise if we were to ignore valid wills executed prior to the creation of challenged MPAA joint accounts by blindly deferring to the section 6304(a) ownership presumption. *Cf. In re Falucco,* 791 A.2d 1177, 1180 (Pa.Super.2002) (concluding the MPAA ownership presumption was not defeated when the creation of an MPAA account was followed by the execution of a valid will five days later as both were part of the same estate plan). The decedent executed a will in 1995. Five years later, on September 15, 2000, decedent executed a codi-

No will or codicil in writing, or any part thereof, can be revoked or altered otherwise than: (1) WILL OR CODICIL. By some other will or codicil in writing; (2) OTHER WRITING. *By some other writing declaring the same, executed and proved in the manner required of wills;* or (3) ACT TO THE DOCUMENT. By being burnt, torn, canceled, obliterated, or destroyed, with the intent and for the purpose of revocation, by

the testator himself or by another person in his presence and by his express direction. If such act is done by any person other than the testator, the direction of the testator must be proved by the oaths or affirmations of two competent witnesses.
20 Pa.C.S.A. § 2505, **Revocation of a will.**

4. We leave the task of defining the scope of the term "consistency" for future cases.

cil republishing her 1995 will. Four days after the execution of the codicil, appellant used his power as decedent's attorney-in-fact to persuade the decedent to invest in a treasury account titled in both the decedent's "or" the appellant's name. No right of survivorship was specifically designated.

¶ 31 At the time the tender was executed, decedent was in a perilous mental condition having been diagnosed with being in an acute confusional state replete with hallucinations, delusional disorder, and with psychotic depression by a clinical psychologist in October of 1999, which degenerated into senile dementia by September of 2001. Record, No. 62, Objector's Exhibits, Exb. KK, Transcribed Notes of 10/15/99 Psychiatric Consultation; T.N. of 10/21/99 Psychiatric Consultation; T.N. of 9/18/01 Psychiatric Consultation; *see contra* Record, No. 39, Master's Report at 13 (finding appellant was "sharp as a tack" based on the testimony of her caregivers who, from what we can discern from the record, had no training in psychiatry). There is no evidence of record demonstrating decedent had any idea what the legal ramifications of titling the treasury account in both her and appellant's names would be. Indeed, appellant testified he did not know whether decedent read the Treasury Direct Investor Kit he provided her with prior to the opening of the treasury account and he also could not produce an exact copy of the edition of the kit he provided to decedent for the orphans' court. N.T., Master's Hearing Vol. 2, at 303 ("I have no knowledge of whether she read the entire thing. I have no knowledge of whether she understood the entire thing."); *see also N.T.*, Master's Hearing Vol. 1, at 74, 86–87.

¶ 32 Appellant was found to be an opportunist who abused his position as decedent's attorney-in-fact to effectuate no fewer then nine unauthorized transactions with decedent's funds. He stood in a con-

fidential relationship with the decedent, executed the treasury account tender with his own hand, and excluded the other members of the family and heirs under the 1995 will and 2000 codicil from the management of decedent's day to day affairs. Appellant reinvested the treasury account principal and proceeds for an extra year without consulting the decedent. The decedent died during the extended reinvestment period.

¶ 33 In conclusion, we find the trial court's analysis reaches the correct legal conclusion, even though it fails to take the most direct analytical route. *See e.g., Nationwide Mut. Ins. Co. v. Fleming*, 924 A.2d 1259, 1269 n. 5 (Pa.Super.2007) ("As an appellate court, we may uphold a decision of the trial court if there is any proper basis for the result reached; thus we are not constrained to affirm on the grounds relied upon by the trial court."), *citing In re Adoption of R.J.S.*, 889 A.2d 92, 98 (Pa.Super.2005) (additional citation omitted). Accordingly, we discern no reversible error in the trial court's decision to order appellant to inventory the treasury account in the Novosielski estate. *In re Estate of Ciaffoni, supra* at 973 (citation omitted).

¶ 34 Order affirmed.

¶ 35 POPOVICH, J., concurs in the result.