**In re ESTATE OF Amelia J. PIET.**

**Appeal of Mary Piet Black (at 123).**

**In re Estate of Amelia
J. Piet, Deceased.**

**Appeal of Ann L. Ball and Edward
J. Piet (at 201).**

Superior Court of Pennsylvania.

Argued Jan. 16, 2008.
Filed April 17, 2008.
Reargument Denied June 30, 2008.

Carol L. Hanna, Bethel Park, for Black.

Seymour A. Sikov, Pittsburgh, for Ball.

Carol S. Gross, Pittsburgh, for Piet.

BEFORE: LALLY–GREEN, PANELLA and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 Mary Piet Black appeals from the portion of the December 12, 2006, Order denying her exceptions to the orphans' court's conclusions of law and findings of fact. Co-executors Ann L. Ball and Edward J. Piet cross-appeal from that portion of the Order denying their exceptions to the court's conclusions and findings.

¶ 2 On May 13, 1978, Edward A. Piet and Amelia J. Piet (decedent), husband

and wife, executed reciprocal wills. The wills provided that upon the death of the first spouse, the entirety of the deceased spouse's estate would pass to the surviving spouse in fee simple. Record, No. 1, Last Will and Testament of Amelia J. Piet. Decedent's will provided, in relevant part, that in the event her husband predeceased her, "all the real and personal property to which [decedent] may be entitled or over which [decedent] may have disposing power at the time of [her] decease" was to pass to her four children—appellant Mary Piet Black, cross-appellant Edward J. Piet, cross-appellant Ann L. Ball, and son Dennis J. Piet[1]—"in equal shares ... absolutely" and that cross-appellants Edward and Ann would serve as co-executors. *Id.*

¶ 3 On June 29, 1986, Edward A. Piet passed away and his entire estate was bequeathed to the decedent. Shortly thereafter, decedent was crippled with various illnesses. The parties assisted her in different ways through the course of these illnesses. Appellant Mary, who had a background as a medical secretary, assisted decedent with her medical needs. N.T., 1/23/06, at 52–53. Cross-appellant Edward, an employee of Conrail railroad, helped decedent administer her deceased husband's Conrail IRA account. *Id.* at 55. Cross-appellant Ann, who had worked in banking for several years, conducted decedent's financial affairs. *Id.*

¶ 4 During the course of the decedent's illness, the attorney who drafted the decedent's 1978 will contacted her by letter dated February 17, 1997. Record, No. 29, Mary Piet Black Pre–Trial Statement, Exb. 5. The purpose of the letter was to determine whether any circumstances had arisen since 1978 which would necessitate changes in the decedent's estate plan. *Id.*

¶ 5 On April 13, 2004, decedent passed away after a lengthy struggle with her various afflictions. Cross-appellants filed an inventory of decedent's estate on December 30, 2004, listing a total of $19,899.37 in assets. On July 26, 2005, appellant filed a petition to show cause as to why the coexecutors should not be removed. Cross-appellants filed a supplemental inventory on August 24, 2005, which listed a total of $98,400.57 in assets. Appellant filed objections to both of these inventories. On September 2, 2005, the co-executors filed a first and final account listing a total of $77,045.56 in liquid assets. On September 14, 2005, the orphans' court issued an Order denying appellant's rule to show cause. Appellant filed objections to the final accounting on October 14, 2005.

¶ 6 In her initial set of objections, appellant argued cross-appellants acted improperly by refusing to include the proceeds of ten different joint accounts, which were listed in the inheritance tax return, as part of decedent's estate. Record, No. 4. The total value of these accounts is $177,239.27, a sum representing the bulk of the decedent's estate. *Id.* at Exb. B, Schedule E, F. Eight of the accounts were jointly titled in decedent and cross-appellant Ann's names—one of these accounts was a National City savings account, one was a National City checking account, and the remainders were National City certificate of deposit accounts (c.o.d.). Record, No. 39, Findings of Fact, Conclusions of Law and Order of Court. The remaining two accounts, a National City investment account with the proceeds of deceased Edward A. Piet's Conrail stock and a Citizens Bank c.o.d. account, were jointly titled in decedent's and cross-appellant Edward's

---

**1.** Dennis J. Piet was not a party to the underlying litigation. In any event, the evidence of record shows he supports appellant's position. *See e.g.,* Record, No. 29, Petitioner, Mary Piet Black, Pre–Trial Statement, Exb. 3.

names. *Id.* Appellant also argued the parties had reached an oral settlement agreement and that cross-appellants had promised to divide decedent's estate, including the joint accounts, equally amongst the surviving heirs. *See e.g.,* Record, No. 39, *supra.*

¶ 7 On February 18, 2005, cross-appellants answered appellant's objections. In doing so, cross-appellants asserted decedent created the subject accounts as joint accounts and that this decision was *prima facie* evidence of the decedent's intent to gift the proceeds of these accounts to the respective surviving joint owners pursuant to 20 Pa.C.S.A. § 6304, **Right of survivorship,** (a) **Joint account,** of the Multiple Party Accounts Act (MPAA),[2] which provides, in relevant part, as follows:

(a) JOINT ACCOUNT.—Any sum remaining on deposit at the death of a party to a joint account belongs to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intent at the time the account is created.

Cross-appellants also denied making any assurances as to the distribution of decedent's estate.

¶ 8 The orphans' court held hearings in the matter in late January and early March of 2006 and on September 18, 2006, issued its findings of fact and conclusions of law. The court concluded appellant was able to show decedent intended the National City checking and savings accounts to be convenience accounts and, hence, was able to successfully overcome the section 6304(a) survivorship presumption with respect to these accounts. Record, No. 39, *supra.* The court, however, overruled appellant's remaining objections and concluded ownership of the National City c.o.d.

accounts passed to cross-appellant Ann, while ownership of the National City investment account and Citizens Bank c.o.d. account passed to cross-appellant Edward. *Id.*

¶ 9 The two sides, however, were dissatisfied with the court's conclusions and on October 6, 2006, both appellant and cross-appellants filed objections to these conclusions. After considering the parties' briefs and after entertaining additional oral argument, the court issued the Order subject of this appeal.

¶ 10 Appellant and cross-appellants each filed a timely notice of appeal and the orphans' court issued corresponding Rule 1925(b) Orders. *See generally,* Pa.R.A.P. 1925, **Opinion in Support of Order.** After securing statements of matters complained of on appeal from both appellant and cross-appellants, the orphans' court issued an Opinion on May 10, 2007.

¶ 11 Appellant raises three issues for our consideration in the appeal docketed at 123 WDA 2007:

A. Whether the lower court erred in excluding from decedent's estate certain assets as a matter of law where the accounts were set up as convenience accounts and clear and convincing evidence indicated the decedent desired to treat all her children equally.

B. Whether the lower court erred in failing to recognize an oral family settlement agreement which was established by clear and unambiguous evidence.

C. Whether the co-executors abused their fiduciary duty and their deceased mother's trust when they surreptitiously converted her assets to their own use against their dead mother's express wishes.

Appellant's brief at 4.

¶ 12 Cross-appellants raise two issues for our consideration in their cross-appeal:

---

2.  20 Pa.C.S.A. § 6301, *et. seq.*

1. Whether the lower Court erred as a matter of law in failing to apply the provisions of the Multiple–Party Accounts Act and capriciously disregarded the lack of clear and convincing evidence required to rebut the presumption of survivorship when it included a joint money savings account as part of the Decedent's probate estate.

2. Whether the lower Court erred as a matter of law in failing to apply the provisions of the Multiple–Party Accounts Act and capriciously disregarded the lack of clear and convincing evidence required to rebut the presumption of survivorship when it included a joint checking account as part of the Decedent's probate estate.

Cross-appellants' brief at 7.

¶ 13 Our standard of review over a final order from the orphans' court requires us to determine whether an error of law, abuse of discretion, or a capricious disregard of evidence has occurred. *In re Estate of Ciaffoni*, 787 A.2d 971, 973 (Pa.Super.2001), *citing In re Benson*, 419 Pa.Super. 582, 615 A.2d 792, 793 (1992). Our scope of review requires us to afford the court's factual findings the same weight as we would a jury verdict. *Id.* We will not disturb those findings absent manifest error. *Id.*

¶ 14 During the pendency of these appeals, this Court decided *In re Estate of Novosielski*, 937 A.2d 449 (Pa.Super.2007), *reargument denied*, 2007 Pa.Super. Lexis 4117*. In *Novosielski*, we were faced with a set of facts similar to those presently before us.

¶ 15 Both *Novosielski* and this controversy involve situations where the decedent has a duly executed will. Both cases involve the creation of joint accounts, after the execution of the respective wills, titled in the name of the decedent and a trusted confidant, wherein the majority of the decedents' liquid assets are deposited. Both cases involve situations where the distributions contemplated by the wills are arguably inconsistent with the distributions which would occur if the joint accounts were controlled by section 6304(a) of the MPAA. And, more importantly, both cases involve a question which implicates the fundamental principles of the law of wills—namely, what effect does a validly executed will have when the assets subject to the will at the time of execution subsequently are placed in a joint MPAA account.

¶ 16 Historically, the ultimate and universal end of the law of wills has been to effectuate testator intent.[3] *See e.g., Lane v. Vick*, 44 U.S. 464, 3 How. 464, 472, 11 L.Ed. 681 (1845) ("Every instrument of

---

**3.** We are speaking of testamentary intent because section 6304(a) speaks to testamentary intent—not the intent to convey an *inter vivos* gift. *See* 20 Pa.C.S.A. § 6304(a) (discussing the "decedent's intent" at ... "death"); *see also In re Estate of Novosielski*, 937 A.2d 449, 452 n. 1 (Pa.Super.2007) (subsequent appellate history omitted). There is no evidence of record indicating the decedent intended the joint accounts to be *inter vivos* gifts and cross-appellants do not allege as much.

The MPAA dichotomy between testamentary and *inter vivos* intent is implicated by the dissent. Judge Lally–Green is concerned our disposition limits one's ability to dispose of personal property once they have a will. This Court, however, is required to presume MPAA account proceeds are not *inter vivos* and/or present joint tenancies without clear and convincing evidence to the contrary. 20 Pa. C.S.A. § 6303, **Ownership during lifetime,** (a) **Joint account,** *accord* at Jt. St. Govt. Comm. Comment. Proceeds placed into an MPAA joint account presumptively are intended as testamentary gifts. We are unaware of any such statutory limitation on other forms of property which could be gifted *inter vivos* and/or through joint tenancy during a testator's life.

writing should be so construed as to effectuate, if practicable, the intention of the parties to it. This principle applies with particular force to a will."); *Ruston v. Ruston*, 2 U.S. 243, 2 Yeates 54, 60, 1 L.Ed. 356 (Pa.1796); *Torbert v. Twining*, 1 Yeates 432, 439 (Pa.1795) ("Unquestionably the intention of the testator is the great polar star by which we must regulate our construction of wills."). This end is designed to serve a right as old as the concept of ownership itself—the right of a human being to shape her legacy by, in part, disposing of her property at death in the way she so desires. The theories one who has standing may use to challenge a will reflect the importance we as a society place on this right. Every manner in which a will can be challenged, whether it be by alleging the testator lacked capacity or by alleging the testator was unduly influenced, etc., all are premised on the same fundamental allegation—i.e., the will should not be enforced because the testator's intent differs from that which is embodied in the language of the will.

■ ¶ 17 The enactment of the MPAA streamlined the distribution of joint bank accounts by creating a presumption that upon the death of one joint account holder a right of survivorship is created in favor of the surviving joint account holder(s). *See In re Estate of Meyers*, 434 Pa.Super. 165, 642 A.2d 525, 527 (1994) (citations omitted). The comments appended to section 6304(a), the section of the MPAA directly at issue, provide, in relevant part, as follows: "The underlying assumption is that most persons who use joint accounts want the survivor or survivors to have all

balances remaining at death." *Id.* at Jt. St. Gov. Comm. Comment.

¶ 18 This comment indicates the drafters of the MPAA intended to craft, and the General Assembly intended to adopt,[4] provisions which are consistent with the ultimate and universally recognized end of will law. Indeed, it seems as though section 6304(a) was drafted with the goal of effectuating testator intent while minimizing the expense of doing so by immunizing certain proceeds held in joint accounts from probate. *See also,* Uniform Probate Code (UPC) §§ 1–102(b)(2)(3), **Purposes; Rules of Construction** (noting that the purposes of the UPC include, *inter alia,* "to discover and make effective the intent of the decedent in distribution of his estate" as well as "to promote a speedy and efficient system for liquidating the estate of the decedent and making distribution to his successors").

¶ 19 The *Novosielski* Court was acutely aware of the legal dilemma that arises when the execution of a valid will, which purports to dispose of the entirety of a decedent's estate and which remains in effect at the time of the decedent's demise, pre-dates the creation of a challenged MPAA account. *Id.* at 456–457. This appeal presents such a scenario.

¶ 20 In *Novosielski*, this Court sketched an analytical framework for controversies such as the one *sub judice*. Recognizing that a valid will can only be revoked or altered in accordance with statute, the *Novosielski* Court found the creation of a joint MPAA account, in of itself, could not function as a revocation or an alteration of a valid will. *Id.* at 457, *citing* 20 Pa.C.S.A.

---

4. The comment to 20 Pa.C.S.A. § 6301, **Definitions,** notes that Pennsylvania's version of the MPAA is derived from section 6 of the Uniform Probate Code (UPC), **Non–Probate Transfers.** The language at issue in 20 Pa. C.S.A. § 6304, **Right of survivorship,** (a) **Joint**

account, is patterned on language contained within UPC § 6–212(a), **Rights at death.** We must assume the General Assembly, in adopting various provisions of the UPC, was aware of the primary purposes of the UPC and agreed these purposes were laudable.

§ 2505, **Revocation of a will.**[5] This Court stated:

> When the execution of a valid will predates the creation of a challenged MPAA account, we must consider whether the intentions expressed in the will can be read in a manner that is consistent with the decision to place assets in the joint MPAA account. If we cannot find such consistency the expression of intent in the will must control. . . .

*Id.,* citing 1 Pa.C.S.A. § 1932(a), Statutes in pari materia; 20 Pa.C.S.A. § 2505, supra.

¶ 21 Upon further analysis, we are convinced the language of section 6304(a) establishes the analytical framework developed by this Court in *Novosielski* is appropriate for controversies such as the one presented herein. Section 6304(a) provides that the ownership presumption will apply to a joint MPAA account, "unless there is clear and convincing evidence of a different intent at the time the account was created." Section 6304(d), **Change by will prohibited,** on the other hand, provides: "A right of survivorship arising from the express terms of an account or under this section, or a beneficiary designation in a trust account cannot be *changed* by will." (Emphasis added.)

■ ¶ 22 Reading this language in *pari materia,* the UPC drafters' underlying assumptions are readily apparent. *See generally,* 1 Pa.C.S.A. § 1932(a), **Statutes in pari materia.** When a decedent has a validly executed will and subsequently places assets governed by the will in a joint account, the will controls if it is inconsistent with the ownership presumption underlying section 6304(a). The language "at the time the account was created" gives a strong indication that the UPC drafters realized a pre-existing will cannot, in any jurisdiction of which we are aware, be revoked or altered merely by executing paperwork placing assets in a joint account. Indeed, the UPC itself does not allow revocation or alteration to be found under such circumstances. *See* UPC § 2–507, **Revocation by Writing of Act.**

■ ¶ 23 Conversely, the language of section 6304(d) indicates that a will which is executed after the creation of a joint account cannot change the disposition contemplated by the section 6304(a) survivorship presumption. The contrast between the language in section 6304(a) and the language in section 6304(d) is logical because, presumably, if a decedent places assets in a joint account and *then* executes a will she did so recognizing she had already diminished her estate by creating the joint account.[6]

---

**5.** There can be little question the drafting of paperwork to open a joint account, in of itself, is clearly insufficient to revoke a valid will:

> No will or codicil in writing, or any part thereof, can be revoked or altered otherwise than: (1) WILL OR CODICIL. By some other will or codicil in writing;(2) OTHER WRITING. By some other writing declaring the same, executed and proved in the manner required of wills; or (3) ACT TO THE DOCUMENT. By being burnt, torn, canceled, obliterated, or destroyed, with the intent and for the purpose of revocation, by the testator himself or by another person in

> his presence and by his express direction. If such act is done by any person other than the testator, the direction of the testator must be proved by the oaths or affirmations of two competent witnesses.

20 Pa.C.S.A. § 2505, **Revocation of will.**

**6.** It could be argued our General Assembly could have simply substituted the phrase "prior will" for the phrase "clear and convincing evidence of a different intent at the time the account is created" if it had intended prior wills to supersede the subsequent creation of a joint MPAA account. 20 Pa.C.S.A. § 6304(a). While this would have clarified

¶ 24 The intentions expressed in the decedent's will in this matter are clear—each child was to inherit one-quarter of the decedent's entire estate:

> If my husband, EDWARD A. PIET, shall predecease me, or if he and I shall die simultaneously or as the result of a common accident or catastrophe or under such circumstances as to render it difficult or impossible to determine with certainty whether he survived me, then, and in any of said events, *I give, devise and bequeath all the real and personal property to which I may be entitled to or over which I may have disposing power at the time of my decease to my four children, EDWARD J. PIET, ANN L. BALL, DENNIS J. PIET AND MARY A. PIET, equally and in equal shares, or unto the survivor of them, absolutely.*

Record, No. 1, *supra* (emphasis added).

¶ 25 There is no indication within the certified record that decedent's will was ever revoked or altered in any manner. *See* 20 Pa.C.S.A. § 2505, *supra*. To the contrary, when decedent's counsel gave her the opportunity to revisit her estate plan, decedent declined. *See* Record, No. 29, Mary Piet Black Pre–Trial Statement, Exb. 5.

¶ 26 The question we must answer is whether the intentions expressed in the will can be read in a manner that is consistent with the decision to place assets in MPAA joint accounts. *Novosielski, supra*

at 457. The first and final accounting filed by cross-appellants lists a net value for the decedent's estate of $77,045.56. Record, No. 13. The value[7] of the joint MPAA accounts at issue is $177,239.27. Record, No. 4, Inheritance Tax Return. The total value of the property decedent owned at the time of death, for our purposes, was roughly $254,284.83. Under the distribution contemplated by decedent's will, each heir stood to take approximately $63,571.21.

¶ 27 If we subtract the value of the joint MPAA accounts, as cross-appellants suggest must be done, the value of the estate dwindles to $77,045.56, the figure reflected in their accounting. Under this scenario, cross-appellant Ann would stand to take approximately $158,384.37—which represents a quarter of the $77,045.56 residual estate plus the value of the joint MPAA accounts she insists she owns; cross-appellant Edward would stand to take approximately $57,377.68—which, again, represents a quarter of the $77,045.56 and the value of the joint MPAA accounts he lays claim on; and appellant would stand to take $19,261.39. Thus, while each heir would stand to take 25% of the decedent's estate under the will, if we adopt cross-appellants' argument Ann would stand to take approximately 62.3% of her mother's estate; Edward would stand to take approximately 23.6%; and appellant Mary would stand to take approximately 7.5%.

the General Assembly's intent for purposes of this appeal, it also would have limited the forms of proof which can be used to defeat the MPAA ownership presumption. For example, if the General Assembly had used the phrase "prior will," one could no longer argue against the ownership presumption by demonstrating a joint MPAA account was created for convenience purposes, etc. Thus, the omission of the phrase "prior will" does not undermine our analysis.

7. The value of the joint MPAA accounts does not account for the tax liability, if any, cross-appellants would incur upon receiving the joint MPAA accounts. This fact does not skew our analysis, however, because the value of the assets reflected in the first and final accounting also does not take into account the individual tax liability, if any, of each heir upon receipt of their share.

¶ 28 The orphans' court's disposition of the decedent's estate and the joint MPAA accounts, if adopted, would alter these percentages. The orphans' court found the National City savings and checking accounts were not subject to the section 6304(a) survivorship presumption. The value of these accounts is approximately $30,931.66. Record, No. 4, Inheritance Tax Return. This number would be subtracted from what cross-appellant Ann would stand to take if all of the joint MPAA accounts to which she laid claim were subject to section 6304(a) and added to the value of the $77,045.56 residual estate, raising the value of the residual estate to $107,977.22.

¶ 29 Thus, if we were to affirm the orphans' court, cross-appellant Ann would stand to take approximately $135,185.63—representing the value of the remaining six National City c.o.d. accounts to which she lays claim plus her one-quarter share of the $107,977.22 of the residual estate; cross-appellant Edward would stand to take $65,100.60; and appellant Mary would stand to take approximately $26,994.31. Thus, under the orphans' court's disposition, Ann would stand to take approximately 53.2% of her mother's estate; Edward would stand to take approximately 25.6%; and Mary would stand to take approximately 10.6%.

¶ 30 The resulting question is whether we should use the 62.3% vs. 25% (Ann)/7.5% vs. 25% (Mary/Dennis) discrepancy for purposes of determining whether there is inconsistency between the decedent's will and the decision to place assets in the joint MPAA accounts or the 53.2% vs. 25% (Ann)/10.6% vs. 25% (Mary/Dennis) discrepancy, which results from the orphans' court's analysis.[8] After careful consideration, we conclude the former approach is appropriate.

¶ 31 In concluding the National City savings and checking accounts were convenience accounts, the orphans' court pointed to testimony offered by cross-appellant Ann indicating the decedent gave Ann access to these accounts "just in case anything happened to [decedent]." Orphans' Court Opinion at 6, citing N.T., 1/27/06, at 14; see also N.T., 3/3–6/06, at 181. Yet, Ann also gave identical testimony when asked about the National City c.o.d. accounts, but the orphans' court determined these c.o.d. accounts were governed by the section 6304(a) survivorship presumption. See N.T., 3/3–6/06 at 177, 181, 253, 255, 258. The court's analysis of the joint MPAA accounts Edward claims suffers from the same flaw; Edward testified the National City investment account holding the Conrail stock was also created in case "something should happen to [decedent]." Id. at 281–283.

¶ 32 The record is not entirely clear as to whether decedent intended the various joint MPAA accounts to be convenience accounts. On the one hand, cross-appellants testified the various joint MPAA accounts were intended to be used in case something happened to the decedent. On the other hand, cross-appellants testified the various joint MPAA accounts were theirs to have. What is clear, however, is that if the orphans' court was able to rely on cross-appellant Ann's testimony to conclude the National City savings and checking accounts were convenience accounts it should have a priori relied on identical testimony to conclude the remaining contested accounts were convenience accounts. Thus, there is an internal inconsistency inherent in the orphans' court's analysis that does not allow us to adopt its

**8.** We did not include the percentages for Edward because they only vary by two percentage points from cross-appellants' scenario to the orphans' court's scenario.

solution. While the evidence is unclear as to whether the accounts were all intended as convenience accounts, the evidence is clear the circumstances surrounding the creation of these various accounts were all, according to cross-appellants themselves, identical.

¶ 33 Thus, the discrepancy we must apply in gauging whether there is inconsistency between the decedent's will and her decision to place the bulk of her assets in joint MPAA accounts is the 62.3% vs. 25% (Ann)/7.5% vs. 25% (Mary/Dennis) discrepancy. This discrepancy creates a glaring inconsistency between the distribution contemplated by the decedent's will and the distribution which would result if the section 6304(a) ownership presumption is applied to the joint MPAA accounts.

¶ 34 As we stated in *Novosielski:*

To apply the ownership presumption would be, for all practical purposes, to use section 6304(a) to revoke the prior will in a manner not contemplated by our statutory scheme. *See* 20 Pa.C.S.A. § 2505. By giving effect to the plain language of section 6304(a) requiring clear and convincing evidence of a different intent to be produced, we are able to read section 6304(a) in a manner consistent with the language and objectives of the Wills Act. *See generally,* 1 Pa.C.S.A. § 1903(a), **Words and Phrases;** 1 Pa. C.S.A. § 1921, **Legislative intent controls;** 1 Pa.C.S.A. § 1932(a). We must give effect to the will. To conclude otherwise would lead to the frustration of testamentary intent and could result in fraud.

*Id.* at 457.

¶ 35 The language of decedent's will extends to every conceivable form of property or ownership rights possessed by the decedent at the time of her death. Appellant Mary is not a mere residual beneficiary whose standing derives from a bequest of what was to be, for want of a more eloquent phrase, left over. Rather, the will makes it clear each of the decedent's children was to be treated equally. To blindly adhere to the section 6304(a) ownership presumption would require us to assume decedent intended to fundamentally alter the distribution contemplated by her will to a degree such that one of her children, cross-appellant Ann, would take 62.3% of the estate while two of her siblings, appellant Mary and Dennis, would take 7.5% of the estate, respectively. We cannot make such an assumption.

¶ 36 The facts of this case, much like the facts of *Novosielski, supra,* serve to further illustrate the problems that could arise if we were to blindly adhere to the section 6304(a) ownership presumption in the face of a previously executed will. The record establishes the decedent suffered from narrow angle glaucoma and cataracts during her life. N.T., 1/23/06, at 4–5, *accord* N.T., 1/26/07, at 15. The orphans' court found decedent was "unsophisticated in financial affairs" and "did not write checks before her husband's death" in 1986. Orphans' Court Opinion, Lucchino, A.J., at 2, *citing* N.T., 1/27/06, at 14. Given her physical limitations and lack of relevant knowledge, decedent relied upon the cross-appellants for assistance with her financial affairs. *Id., citing* N.T., 1/27/06, at 15. It stands to reason from these facts that the "underlying assumption" of section 6304(a)—namely, that "most persons who use joint accounts want the survivor or survivors to have all balances remaining at death"—is undermined in this instance given the decedent's ignorance of basic financial concepts such as check writing.

¶ 37 Cross-appellant Ann, who had experience in the banking industry, rendered the majority of the financial assistance decedent required. N.T., 3/3/06, at 7–8. She often drafted decedent's checks and paid

bills on decedent's behalf. Orphans' Court Opinion, at 2, *citing* N.T., 1/27/06, at 15. In sum, the evidence of record establishes Ann, and to a lesser degree cross-appellant Edward, exercised total control over decedent's financial affairs prior to her death.

¶ 38 Cross-appellants offered signature cards into evidence for seven of the eight joint MPAA accounts cross-appellant Ann claims. Record, No. 24, Co–Executors' Motion for Summary Judgment, Exbs. D–J. Two of these signature cards have boxes which can be checked if the account creator wishes to vest a right of survivorship in a third-party; neither box is checked. *Id.* at Exbs. D, E. Indeed, not a single one of the signature cards indicates the decedent intended to create an express right of survivorship in the accounts. Cross-appellants also offered account summaries into evidence for the two joint MPAA accounts cross-appellant Edward lays claims, in lieu of signature cards. *Id.* at Exbs. K, U. Neither summary gives any indication either account was created with an express right of survivorship. *Id.*

¶ 39 Even more troubling, however, are the allegations of inappropriate behavior leveled at cross-appellant Ann in the handling of her mother's financial affairs. Evidence was introduced at trial which demonstrates someone had forged decedent's signature to another unrelated investment account for purposes of changing the beneficiaries of the account from the decedent's four children to Ann and her progeny. N.T., 3/6/06, at 428–431, 444–445.

¶ 40 In conclusion, we affirm the orphans' court's Order with respect to the distribution of the National City savings account and the National City checking account. We reverse the Order with respect to the distribution of the remaining six National City c.o.d. accounts, the National City investment account, and the Citizens Bank c.o.d. account—all eight of these accounts are now assets of the decedent's estate.

¶ 41 By virtue of our disposition today, issue B raised in the appeal at 123 WDA 2007 is moot. Issue C at 123 WDA 2007 is phrased as a breach of fiduciary duty issue but there is no evidence of record indicating appellant filed a complaint raising a breach of fiduciary duty claim against cross-appellants and there is no indication what relief is sought in conjunction with this issue; as an appellate court, we cannot make a determination as to liability in the first instance. Accordingly, we need not reach issue C as it is not ripe for disposition. All other issues raised in the appeal at 123 WDA 2007 and the cross-appeal at 201 WDA 2007 have been adjudicated.

¶ 42 Order affirmed in part and reversed in part in accordance with this Opinion.

¶ 43 Jurisdiction relinquished.

¶ 44 Dissenting Statement by LALLY–GREEN, J.

DISSENTING STATEMENT BY LALLY–GREEN, J.:

¶ 1 The highly regarded majority relies on *In re Estate of Novosielski*, 937 A.2d 449 (Pa.Super.2007), to support its conclusion that clear and convincing evidence existed of a "different intent at the time the account" was created because a will predated the creation of a joint account. I respectfully disagree that *Novosielski* controls the instant case. Further, I am inclined to suggest that the conclusion in *Novosielski* may be limited to the unusual facts of the case.

¶ 2 In *Novosielski*, decedent was an elderly woman who was in documented poor mental health in 1999 (that eventually became senility in 2001). *Id.* at 458. Decedent gave the appellant a power of attorney on August 25, 2000. The appellant

then consolidated all of decedent's assets into one account. On September 15, less than one month later, decedent executed a codicil to her 1995 will that named the appellant executor and provided appellant with a devise of $5,000.00.

¶ 3 Four days later, on September 19, 2000, the appellant drafted, the decedent executed, and the appellant dated the documentation for investment in a Treasury–Direct account. The investment was in the amount of $500,000.00 and in the name of decedent "or" appellant. The terms of the agreement provided that after one year, the account's principal and interest would be payable to decedent's bank. Instead of allowing the account to pour over to the bank account at year's end, and without consulting decedent, the appellant renewed the Treasury–Direct account for another year. *Id.* at 452. Shortly thereafter, decedent died.

¶ 4 The Superior Court concluded[9] that the presumption of a joint account set forth in 20 Pa.C.S.A. § 6304(a) had been rebutted and that clear and convincing evidence existed of a different intent at the time the account was created. The Court explained that:

> When the execution of a valid will predates the creation of a challenged MPAA joint account, we must consider whether the intentions expressed in the will can be read in a manner that is consistent with the decision to place assets in the MPAA joint account. If we cannot find such consistency the expression of intent in the will must control unless we determine that the creation of

the joint account functions as a revocation of the validly executed will.

*Id.* at 457.

¶ 5 First, I respectfully suggest that *Novosielski* does not control our case because it can be distinguished on its facts. In *Novosielski*, the four-day time period between the codicil and the creation of the joint account, the absence of witnesses, other documentation of appellant's abuse of the power-of-attorney decedent gave to him, and decedent's diminished mental state all were relevant to the conclusion in the totality of the circumstances that the presumption had been rebutted. Four days after executing the codicil and restating the non-changed aspects of the will, decedent entered into the joint account which would have given appellant $500,000.00. This transformed the testamentary scheme from a devise to appellant of 1/10 of the estate to 4/5 of the estate **in a mere four days.** Thus, under the unique facts of *Novosielski*, the temporal proximity between the execution of the codicil and the creation of the account was a factor to be considered in determining whether the § 6304(a) presumption had been overcome.

¶ 6 In addition, there was no evidence that decedent understood that she was creating a joint account. No one witnessed the transaction except the appellant. Decedent's mental state was documented as being diminished but not yet senile. Also, the trial court found, and the appellate court observed, that appellant had, on other occasions, abused his authority under the power of attorney. All of these factors as a totality permitted the conclusion that

9. The trial court found that appellant had engaged in unauthorized transactions with the money in the joint account against the wishes of decedent. *Id.* at 458. The trial court concluded that appellant was "an op-

portunist who abused his position as decedent's attorney-in-fact to effectuate no fewer then [sic] nine unauthorized transactions with decedent's funds." *Id.*

the § 6304(a) presumption had been rebutted by clear and convincing evidence.

¶ 7 In the instant matter, the testimony of record reflects that decedent intended to create joint accounts with rights of survivorship at the time the accounts were created. N.T., 1/27/06, at 109–115; N.T., 3/3/06, at 119–131. The record does not reflect clear and convincing evidence that decedent had a different, non-donative intent when she created the accounts. In contrast to *Novosielski*, the record does not reflect that four days beforehand the decedent had executed a codicil to a will with a profoundly different testamentary scheme. It does not reflect that decedent had a diminished mental state. It does not reflect any abuse of authority by the surviving parties to the joint accounts.

¶ 8 Appellee/Cross–Appellant Mary Piet Black sought to rebut the statutory presumption when she testified that decedent did not discuss with Black the creation of the subject accounts, and did not check the "survivorship" box on several signature cards. N.T., 1/23/06, 1/27/06, at 68. A challenger's lack of knowledge of the creation of a joint account with rights of survivorship is not "clear and convincing evidence" of the decedent's "different intent at the time the account" was created. The presence or absence of signature card evidence is likewise not dispositive.[10] *See In re Sipe*, 492 Pa. 125, 422 A.2d 826 (1980). Thus, I respectfully disagree that *Novosielski* controls here and I suggest that the record reflects that the presumption of § 6304(a) has not been rebutted by the requisite clear and convincing evidence.

¶ 9 Second, I am inclined to suggest that the Court's conclusion in *Novosielski* may be limited to the unusual facts of the case. It has been the law for centuries in the Commonwealth that regardless of what is devised in a will and to whom it is devised, a testator can gift away any or all assets during his or her lifetime as long as donative intent and delivery are present. The gifting can occur in many forms from an outright *inter vivos* gift to a gift that occurs in a joint tenancy with rights of survivorship by the death of one joint tenant and the passing of the gift to the survivor. All such gifts take effect outside of the estate that passes by will.

¶ 10 I am hesitant to read *Novosielski* as authority for the proposition that the execution of a will interferes with the testator's ability to engage in in-life gifting. The majority attaches great weight to the sanctity of testator intent. As the majority correctly recognizes, testamentary schemes can be altered only by an amendment to, or a revocation of, a will. I do not believe that creation of a joint account with a right of survivorship alters the testamentary scheme. Rather, such an account alters the amount in the estate. The execution of a will does not prevent the testator from subsequently altering the amount in the estate as he or she sees fit, such as by the creation of a joint account or through *inter vivos* gifting. The testamentary scheme, which is set forth in a duly executed will or codicil, governs the estate as it exists at the time of the testator's death. Section 6304 reflects this long-standing legal framework and refuses to disturb it unless there is clear and convincing evidence to the contrary.

¶ 11 I respectfully suggest that *Novosielski* is a case based on a unique set of facts and is not authority for the general

---

10. Furthermore, the record before us makes clear that signature cards can vary from bank to bank and contain large amounts of fine print. I would be hesitant to give significant weight to the signature cards in determining whether the § 6304(a) presumption has been overcome.

proposition that the execution of a will interferes with the testator's ability to engage in in-life gifting. Rather, the focus of the inquiry under § 6304(a) should be, as the statute states, whether clear and convincing evidence exists of a different intent at the time of the creation of the account. Here, the statutory presumption that the intent was that of a joint account with rights of survivorship remains, in my view, unrebutted in the record.

¶ 12 In light of the foregoing, I would reverse the trial court's ruling that two of the disputed accounts are part of the decedent's estate. I would affirm the trial court's ruling that the remaining accounts are not part of the decedent's estate.[11]

¶ 13 For the foregoing reasons, I respectfully dissent.

---

**11.** Furthermore, my review of the record fails to reflect evidence of an alleged settlement agreement whereby the account proceeds were to be divided equally among the decedent's children. I would, therefore, affirm the trial court's ruling that Appellee/Cross–Appellant has failed to prove the existence of any such agreement.