**Pasquale A. RISSI, Appellant**

v.

**Michael CAPPELLA and West Butler Enterprises, Inc., Appellees.**

Superior Court of Pennsylvania.

Argued Oct. 31, 2006.

Filed Feb. 21, 2007.

Martin N. Ghen, Doylestown, for appellant.

David J. Juall, Durham, for appellee.

BEFORE: BENDER, BOWES, JJ. and McEWEN, P.J.E.

OPINION BY BENDER, J.:

¶ 1 Pasquale A. Rissi (Appellant) appeals from the judgment entered in favor of Michael Cappella (Appellee) at the conclusion of an action to partition the assets of West Butler Enterprises, Inc. (WBE). Appellant claims that the trial court erred in concluding that a contract implied in fact did not exist. We agree, and therefore, we vacate the judgment and grant Appellant a new trial.

¶ 2 This action was commenced by Appellant against Appellee. The matter proceeded to a non-jury trial and the trial court issued an opinion setting forth the facts of the case as follows:

At the heart of this litigation was the determination of [the] scope of assets between two partners Pasquale Rissi (Rissi) and Michael Cappella (Cappella). Rissi and Cappella jointly formed a corporation whose business purpose was "to engage in [the] food and beverage restaurant business." Due to constant bickering the friendship and business relationship dissolved and litigation ensued. The issue at trial was how to properly distribute and categorize assets operated by Rissi and Cappella, as personal or corporate. The Court determined that of the two restaurants that were operated by Rissi and Cappella, under the name the corporate entity of West Butler Enterprises (WBE), only one restaurant was a corporate asset, and of the two liquor licenses that were used by the corporation, only one liquor license constituted a corporate asset. In sum, only the Roasted Pepper North and its liquor license constituted corporate assets of West Butler Enterprises (WBE).

Pasquale Rissi (Rissi) and Michael Cappella (Cappella) met sometime in the late 70's or early 80's through mutual friends and similar business associations. It was not until Cappella opened his restaurant, the Roasted Pepper South, [Fn.3], on April 1, 1985, in Chalfont, Pennsylvania, did they become close friends. At first Rissi was merely an acquaintance and a regular customer of Cappella's, but over the years as their friendship grew they often gave business advice to each other, with Rissi becoming very familiar with the operations of the Roasted Pepper South.

[Fn.3] This restaurant was originally named the Roasted Pepper. It would later be known as the Roasted Pepper South when the Doylestown Roasted Pepper was opened, and that restaurant was referred to as the Roasted Pepper North. Here, for the sake of

simplicity, we will immediately refer to the Roasted Pepper in Chalfont as the Roasted Pepper South even though we have not discussed the advent of the Roasted Pepper North.

In 1996 Rissi suggested to Cappella to obtain a liquor license to boost sales at the Roasted Pepper South. Cappella agreed, and he pursued a license. Soon thereafter Rissi learned that the Pennsylvania Liquor Control Board (PLCB) had started a new program where certain areas would be designated as "resorts" and a limited number of licenses would be issued to qualifying locations. However, it was mandatory for the licenses to be acquired in the name of a corporation rather than an individual. So Cappella and Rissi formed West Butler Enterprises (WBE) and acquired a "Resort" liquor license. The cost of the application to the PLCB was completely borne by Cappella.

On June 14, 1996, WBE was incorporated. *Gary Pollen (Pollen), WBE's accountant, testified that Cappella was the owner of the Roasted Pepper South and it should not be considered a corporate asset.* [Fn. 5] Supporting this fact is the *lack of any documentation* transferring the Roasted Pepper South to WBE as a corporate asset. Even though it took Pollen sometime to get acquainted with WBE's financial situation he unequivocally testified that Cappella was the owner of the Roasted Pepper South and it should not be considered a corporate asset. Supporting this fact is the *lack of any documentation* transferring the Roasted Pepper South to WBE as a corporate asset.

[Fn. 5] **Pollen Deposition, 10/20/05, pg. 47–50.**

Of the fifty total shares that composed WBE, Cappella gave Rissi twenty-five. These shares were given as a managerial incentive for Rissi to help expand the Roasted Pepper name. It was Cappella's goal to grow the Roasted Pepper name into a franchise, but in trying to realize this goal Cappella knew he needed help and Rissi was already acquainted with his business operations. Around this time Rissi personally lent Cappella $30,000 to help expand the Roasted Pepper South.

On August 1, 1998, WBE purchased a restaurant in Doylestown, Pennsylvania for the price of $100,000, $15,000 down and the balance paid over a ten-year period. WBE performed extensive renovations to the leasehold, entered into a new lease with the landlord and eventually opened a new restaurant known as Roasted Pepper North. Rissi contributed $7,500 and Cappella, initially contributed $5,000 to the purchase of the Roasted Pepper North. With the acquisition of the Roasted Pepper North Rissi and Cappella agreed that Cappella would continue to run his restaurant, the Roasted Pepper South, and Rissi would primarily run the new restaurant in Doylestown. The Roasted Pepper North required more financing than both Rissi and Cappella had initially anticipated. To ensure the Roasted Pepper North's survival Cappella contributed an additional $141,061.89. Rissi did not contribute any further monies beyond his initial $7,500 investment.

In early 2001 both parties came to an impasse as to how the Roasted Pepper South and the Roasted Pepper North should be managed. In 2002, with neither Rissi nor Cappella being able to properly co-exist under the WBE corporate umbrella, they initiated claims against one another to determine each party's rights and interests in the assets of WBE. This determination would ultimately result in the monetary amount

due to either party upon WBE's dissolution.

On October 1, 2002, an agreed order was entered into by both Rissi and Cappella in front of this Court. The purpose of this order was to allow parties to properly comply with the Pennsylvania Liquor License Statutes and aid in the daily operations and management of the two restaurants and liquor licenses. Upon plaintiff's petition, and request for oral argument, a hearing was held in front of the Honorable Robert J. Mellon. As a result of the parties' attendance and the Court's discussions with counsel, the parties entered into an Agreed Order wherein, *inter alia,* Rissi would continue to operate the Roasted Pepper North and Cappella would continue to operate the Roasted Pepper South. Rissi agreed to post an Indemnity Bond with the Prothonotary of the Court of Common Pleas of Bucks County, Pennsylvania, in favor of Cappella and once the bond was filed Cappella would transfer to Rissi 25 shares of WBE resulting in Rissi being the 100% owner of WBE. The Order was entered into with the understanding that "the issue of allocation of the value of West Butler Enterprises, Inc.'s restaurant at Roasted Pepper North and the value of what will be the former West Butler Enterprises, Inc.'s restaurant Roasted Pepper (Chalfont shall be the subject or continue to be the subject of the litigation on the underlying complaint.)"

On December 3, 2004, Rissi properly filed the Indemnity Bond with this Court. Thereafter, Cappella transferred his 25 shares to Rissi, resulting in Rissi being 100% owner of the WBE. However, before this transfer occurred,

and while Cappella was still a 50% owner in WBE, Rissi on November 9, 2004, entered an agreement for sale on behalf of WBE to sell the Roasted Pepper North without Cappella's consent.

The matter was heard in a two day non jury trial on December 19, 2005 and ended on December 20, 2005 wherein a verdict was returned in favor of Cappella in the amount of $120,003.57. A Notice of appeal was filed on March 17, 2006, followed by Rissi's 1925(b) Statement, which resulted in this Opinion. Trial Court Opinion (T.C.O.), 6/27/06, at 1–5 (footnotes omitted) (emphasis added).[1] In short, the court awarded Appellee $120,003.57 from the Roasted Pepper North sale proceeds of $235,000 and furthermore, held that Appellee was the sole owner of Roasted Pepper South. Thus, Appellant lost all interest in the Roasted Pepper South and received less than half of the proceeds from the sale of the Roasted Pepper North.

¶ 3 In this appeal, Appellant presents four questions for our review:

1. Was the trial judge's conclusion that because of the lack of documentation appellant's claim that one of the two restaurants and its liquor license, Roasted Pepper Chalfont, although operated by the parties as part of a corporate entity, were not assets of the corporation against the law and not supported by competent evidence?

2. Was the trial judge's conclusion that the Roasted Pepper restaurant in Chalfont and its Pennsylvania Liquor License and in addition thereto the sum of $141,061.89 of alleged personal funds invested by one shareholder into the corporation

---

1. The court did not mention that Appellant filed a post-trial motion claiming that the court's conclusion that the Roasted Pepper South was not an asset of WBE was against the weight of the evidence. The trial court denied the motion.

[was] not corporate property not supported by competent evidence?

3. Did the trial judge commit reversible error when he over the objection of counsel admitted into evidence hearsay evidence and documentation and evidence of offer and compromise that formed the basis of his decision or made determinations concerning the credibility of the appellant based on that evidence?

4. Did the trial judge commit reversible error when he based his decision regarding damages on an alleged agreement of counsel which never occurred?

Brief for Appellant at 4.

¶ 4 The central issue in this appeal is whether the Roasted Pepper South and its liquor license were corporate assets of WBE. Appellant's first three questions are aimed directly at showing that the trial court erred in its determination that Appellee was the exclusive owner of the Roasted Pepper South and the liquor license. For the sake of clarity, we have intertwined our analysis of the first three questions. And as we rule in Appellant's favor on these first three issues and grant him a new trial, we are refraining from addressing Appellant's fourth question that challenges the court's ruling on damages.

¶ 5 We begin with our standard and scope of review in an appeal from a non-jury verdict.

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law.

*Diener Brick Co. v. Mastro Masonry Contractor,* 885 A.2d 1034, 1038 (Pa.Super.2005).

¶ 6 Before we address the trial court's legal conclusions, we first consider Appellant's challenges to the court's factual determinations and its ruling on the admissibility of certain evidence that formed the basis for an important finding by the trial court. Not surprisingly, each of these challenged factual determinations militates against Appellant's claim that the Roasted Pepper South and the liquor license were corporate assets of WBE. Undoubtedly, an accurate account of the facts that transpired between the parties and their operation of the restaurant is indispensable as we review the legal arguments discussed below.

¶ 7 The evidence at trial consisted mainly of testimony from Appellant, and Appellee, and deposition testimony from the corporation's prior attorney, James F. Detwiler, Esquire, and the corporation's accountant, Gary Pollen, and various documents such as a lease, tax returns, license applications and corporate documents.[2] We shall first address Appellant's claim that the trial court misconstrued and misinterpreted Pollen's testimony when it stated, "Gary Pollen (Pollen), WBE's ac-

2. Pollen also filed individual tax returns for Appellant and Appellee. Pollen Deposition at 33.

countant, testified that [Appellee] was the owner of the Roasted Pepper South and it should not be considered a corporate asset." T.C.O. at 2 (citing pages 47–50 of Pollen's deposition). We have reviewed Pollen's deposition, and pages 47 through 50 in particular. Nowhere does Pollen state that the Roasted Pepper South should *not* be considered a corporate asset. A review of pages 47 through 50 shows merely that Pollen answered a hypothetical question posed by Appellee's attorney regarding whether it would be possible for WBE to operate the Roasted Pepper South while Appellee still owned the assets. Pollen answered that such an arrangement would be possible. However, he certainly did not state that this was the actual arrangement in place.

¶ 8 The definitive statements regarding Pollen's opinion on this matter actually appear in pages 26 through 29 of his deposition where Pollen was asked about the formation of WBE, the financial arrangements between Appellant and Appellee, and the assets of the Roasted Pepper South. Pollen testified as follows:

Q: From the records that we have, the tax returns that we have, could you tell us what your assumptions were that you made just to get things going?

A: I assumed that each party put up some money. My understanding was that … [Appellant] is coming in to help [Appellee] out of some problems, that … he either had lent him money or was lending him money to get out of some problems, that this corporation was formed, that they were going to buy a liquor license. I didn't know the liquor license had been bought in the year prior and **that that was going to be part of the corporate assets**, okay.

So what we did was—and in the formation of this corporation when we filed [Appellee's] 1997 individual tax return

**we took the remaining book value of assets on his company's books and we transferred that into the corporation?**

Q: What was that?

A: **It was about $2,500. If he had been in business since 1985 and this is 1997, there was not a whole lot of new assets and service so everything had been pretty much fully depreciated, so there was not a lot of assets going in except that he had a very viable business, you know viable concern.**

**I didn't put any value on that ongoing good will. I had a number of depreciable assets that I can pick up and transfer that into the corporation.**

Pollen Deposition, 28–29 (emphasis added). The foregoing shows that for purposes of Pollen's role as Appellee's personal accountant and as accountant for WBE, the assets of the Roasted Pepper South and its liquor license were transferred into the corporation in 1998. Pollen's testimony was that Appellee contributed the Roasted Pepper South's assets as starting capital to WBE and that Appellant contributed cash. *Id.* at 29–30. The 1998 Internal Revenue Service (IRS) tax return for WBE lists a number of depreciable assets, among which, according to Pollen's testimony, were included the assets of the Roasted Pepper South. Reproduced Record (R.) at 329a. Consistent with this testimony, Pollen also testified:

Q: Did you know [Appellee's] history at the restaurant prior to it becoming part of the corporation?

A: I learned upon investigation of what I had to do to get problems straight. I learned that after I had to go in and take care of this problem, I did not know that before then.

Q: But you knew that—**did you know that the restaurant was an asset of the corporation?**

A: I believed that to be the case from the beginning.

Pollen Deposition at 27 (emphasis added). In light of the foregoing testimony, we conclude that the trial court misconstrued the record when it stated that Pollen testified that the Roasted Pepper South should not be considered an asset of WBE and, in fact, the record can only support the opposite conclusion regarding Pollen's testimony on this matter.

¶ 9 Next, Appellant challenges the court's finding that the cost of the Roasted Pepper South liquor license was completely borne by Appellee. On page two of the trial court opinion, the court states, "The cost of the application to the PLCB was completely borne by [Appellee]." T.C.O. at 2. What the court neglects to mention is that the *application cost* paid by Appellee was only $700, and the much greater cost of the license itself ($13,600) was paid entirely by Appellant. N.T., 12/19/05, at 42, 92; Detwiler Deposition at 27. In addition, Appellee admitted that Appellant lent him $30,000, and consequently, Appellant's initial investment in the Roasted Pepper South was approximately $43,600, and not the $30,000 often repeated by the trial court throughout its opinion.

¶ 10 Appellant also claims that the trial court erroneously admitted hearsay evidence. "The admission or exclusion of evidence is within the sound discretion of the trial court, and in reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law." *McManamon v. Washko*, 906 A.2d 1259, 1268 (Pa.Super.2006) (quotation marks omitted). "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Turney Media*

*Fuel, Inc. v. Toll Bros., Inc.*, 725 A.2d 836, 839 (Pa.Super.1999).

¶ 11 The challenged evidence is an offer of purchase from a prospective buyer of the Roasted Pepper South, dated May 21, 1996. Appellee's counsel introduced the document during Appellant's testimony in an effort to impeach Appellant's claim that he had paid approximately $43,000 for a fifty percent interest in the Roasted Pepper South, which in Appellant's opinion was a fair deal for both parties. The testimony was as follows:

Q: Do you recall back in 1996—and at the same time I'm handing up D–24—whether .[Appellee] received an offer to sell the '[Roasted 'Pepper South], and this was pre-liquor license, do you recall that?

A: I recall a deal where he was going to take a partner.

Q: I'll be more specific. Do you recall a transaction where a Linda Liberator had made an offer in writing to Mr. Cappella to purchase the Chalfont location?

A: I never seen [sic] that offer.

Q: ... Is it your testimony, sir, that you have never seen that document before?

A: I don't remember seeing this document, no.

Q: Sir, it identifies a purchase price of the Chalfont location of $175,000, is that correct?

N.T., 12/19/05, at 88–89. Appellant's counsel made a hearsay objection at this point and the trial court overruled the objection, reasoning that the document spoke for itself.

¶ 12 In its opinion, the court states that the document was not hearsay because it "was used to impeach the credibility of [Appellant]." T.C.O. at 10. This is a plain error of law by the trial court. Initially,

we note that the document was clearly hearsay. Hearsay is defined pursuant to Pa.R.E. 801, which states that hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). Although the trial court concluded that the document was not offered to prove the truth of the matter asserted, it was in fact offered to show that an offer to purchase the Roasted Pepper South was made for an amount of $175,000. It was offered to prove this matter because if in fact such an offer was made it would undercut Appellant's testimony that $43,000 was a fair price for fifty percent of the Roasted Pepper South.

██ ¶ 13 Furthermore, the document was not admissible simply because it was used to impeach Appellant's testimony. Of course "[a] party may impeach the credibility of an adverse witness by introducing evidence that the witness has made one or more statements inconsistent with his trial testimony." *McManamon*, 906 A.2d at 1268 (quotation marks omitted). *See also* Pa.R.E. 613(a) ("Examining witness concerning prior inconsistent statement"). And pursuant to Pa.R.E. 803.1, the inconsistent statement is admissible in limited circumstances even though it is hearsay. Thus, a document containing hearsay may be used to impeach a witness when it "is a writing signed and adopted by the declarant." Pa.R.E. 803.1(1)(b).

¶ 14 In the instant case, not only was the document not signed or adopted by Appellant, he disclaimed any knowledge of it altogether. It was not a prior inconsistent statement and it is not admissible under any exception to the hearsay rule. Therefore, the trial court's reasoning that this hearsay evidence could be used for impeachment purposes was erroneous.

██ ¶ 15 The trial court reasoned in its opinion that even if it erred in admitting the document, this error was harmless because the value of the Roasted Pepper South was "immaterial." T.C.O. at 10. We are surprised that the trial court would make a statement so at odds with the facts of this case. The value of the Roasted Pepper South was obviously material because Appellant's main claim regarding the restaurant was that he paid approximately $43,000 for a fifty percent stake in the restaurant via his share of WBE stock, and that this amount was a fair price for the fifty percent stake. Conversely, Appellee claimed that Appellant only loaned Appellee $30,000 and that Appellee retained exclusive ownership of the restaurant while WBE simply "operated" the restaurant. Indeed, one could say that a large part of Appellant's case hinged on his credibility. In this regard, the document was devastating, as it showed that Appellant's payment of $43,000 was certainly not a fair deal for a fifty percent stake in the restaurant, and therefore, such a deal never in fact transpired between Appellant and Appellee.

¶ 16 And the document's effect is clear from the colloquy between the court and Appellant after the document was introduced:

> The Court: And you just told me that your deal was just okay when this person was offering double and then some, the same thing you got for 30, and you think that was an okay deal?
>
> The Witness: Yes, Your Honor, I did think.
>
> The Court: Yeah, okay.
>
> The Witness: Can I say something, Your Honor?
>
> The Court: No.

N.T., 12/20/05, at 91–92. Furthermore, in its opinion, the trial court makes clear that it found Appellant's testimony on this mat-

ter to be not credible. Thus, the court stated, "Not only did the corporations [sic] own accountant testify[ ] on several occasions that the Roasted Pepper South was not a corporate asset, but the Court was hard pressed to believe that [Appellee] transferred half of an asset worth in excess of $175,000 in consideration of a $30,000 personal loan." T.C.O. at 3 n. 9. The trial court accepted the value of $175,000 set forth in the document as an accurate assessment of the value of the Roasted Pepper South despite the lack of any other evidence of record supporting this valuation. It is noteworthy that at that point in time the Roasted Pepper South had no liquor license, Appellee's financial situation was so poor that he had to borrow money to pay back taxes, and the restaurant's equipment was over ten years old with a depreciated book value, according to Pollen, of about $2500. Without any real estate, it defies logic to expect that such an establishment would be worth $175,000. Nonetheless, the trial court concluded it was Appellant who "completely lacked credibility." T.C.O. at 10. This determination was clearly based on the improperly admitted document, and therefore, there can be no doubt that Appellant was prejudiced by its admission. This error alone entitles Appellant to a new trial. *See Toll Bros., Inc.*, 725 A.2d at 839.

▇▇▇▇ ¶ 17 Having addressed all of Appellant's factual and evidentiary claims, we now turn to his substantive claim that the trial court's conclusion that the Roasted Pepper South was not an asset of WBE was against the weight of the evidence.

[O]ur scope of review on a weight of the evidence claim is very limited. We will respect the trial court's findings with regard to credibility and weight of the evidence unless it can be shown that the lower court's determination was manifestly erroneous, arbitrary and capricious or flagrantly contrary to the evidence.

*Hollock v. Erie Ins. Exchange*, 842 A.2d 409, 417 (Pa.Super.2004). "This Court's review of a weight claim is a review of the trial court's exercise of discretion, not of the underlying question of whether we believe that the verdict is against the weight of the evidence." *Birt v. Firstenergy Corp.*, 891 A.2d 1281, 1286 (Pa.Super.2006).

▇▇▇▇▇ ¶ 18 The crux of Appellant's claim is that he and Appellee's actions gave rise to an agreement whereby they would form a corporation (WBE) that would own the Roasted Pepper South and the liquor license that they would apply for, and in exchange, Appellant would pay Appellee $30,000 and would also pay the cost of the liquor license ($13,600). Despite the lack of a writing embodying this agreement, Appellant claims that the surrounding circumstances show that this became the agreement between the parties. Thus, Appellant is arguing that a contract in fact arose between the parties. "A contract, implied in fact, is an actual contract which arises where the parties agree upon the obligations to be incurred, but their intention, **instead of being expressed in words,** is inferred from their acts in the light of the surrounding circumstances." *Martin v. Little, Brown and Co.*, 304 Pa.Super. 424, 450 A.2d 984, 987 (1981) (emphasis added).

A contract implied in fact can be found by looking to the surrounding facts of the parties' dealings. Offer and acceptance need not be identifiable and the moment of formation need not be pinpointed. Implied contracts ... arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract.

*Ingrassia Const. Co., Inc. v. Walsh*, 337 Pa.Super. 58, 486 A.2d 478, 483 (1984).

¶ 19 In the instant case, Appellant argues that the trial court discounted the many circumstances that weighed heavily in favor of finding a contract implied in fact and placed undue importance on the fact there was no writing transferring the assets of the Roasted Pepper South from Appellee to WBE. We shall not rehash our discussion above in which we recognized Pollen's testimony that unequivocally stated that the Roasted Pepper South's assets were owned by WBE. Furthermore, we've already stated that absent the erroneously admitted hearsay document, there is nothing in the record to establish the value of the Roasted Pepper South at the time that it was solely owned by Appellee, a time at which the restaurant consisted solely of an ongoing establishment on leased premises with aged equipment and without a liquor license.

¶ 20 There are several other pieces of evidence that Appellant relies on in arguing that a contract implied in fact arose between the parties. The first of these is the lease for the premises of the Roasted Pepper South. R. at 287a. The lease, dated June 1, 1997, is in the name of both Appellant and Appellee "known as West Butler Enterprises, Inc." Thus, Appellee did not have sole control of the premises, but instead shared control of the premises with Appellant through WBE. In considering the lease, the trial court noted that it did not include a list of the restaurant's assets and was "merely a leasehold agreement entered into on behalf of a corporation for its benefit." T.C.O. at 11. Such a statement indicates that the trial court did not appreciate the meaning of the lease. The Roasted Pepper South could not operate without the lease for its premises. Appellant or WBE enjoyed rights equal to Appellee's right under the lease, and consequently the lease demonstrates that Appellee had relinquished to Appellant or WBE partial control of one of the most important assets of the Roasted Pepper South, i.e., control over its location.

¶ 21 Next, the court stated that the "federal and state tax filings have nothing to do with the underlying assets of a corporation." T.C.O. at 12. This is patently false. If a corporation has assets that are to be depreciated, thereby reducing the corporation's tax liability, then those assets must be listed on the corporation's tax returns. In the instant case, WBE's tax returns are part of the record and were referenced several times during Pollen's deposition. R. at 326a–83a. As stated above, WBE's returns include the assets of the Roasted Pepper South as depreciable assets. We recognize that these returns were filed with the IRS, and that the representations contained therein are presumed to be true; unless of course one is committing tax fraud. Thus, the trial court either neglected to review WBE's tax returns or it simply did not understand their importance and overlooked the schedules of assets.

¶ 22 Finally, there is the valuable liquor license, which was applied for in the name of WBE and all documents relating thereto were signed by Appellee and Appellant in their corporate capacities as president and vice president of WBE, respectively. While the application and all documents related to the liquor license indicate that WBE is the licensee, the trial court concluded that the application was irrelevant in determining the assets of WBE. However, the liquor license was an asset itself and per the express terms of the liquor license, the license was issued to WBE.

¶ 23 Based on the foregoing, we conclude that the trial court abused its discretion in concluding that a contract implied in fact did not exist and that Appellee was the sole owner of the Roasted Pepper South and its liquor license. Such a conclusion is flagrantly contrary to the evi-

142

dence of record.   Accordingly, Appellant is entitled to a new trial.

¶ 24 Judgment vacated.   Case remanded.   Jurisdiction relinquished.

¶ 25 McEwen, P.J.E., concurs in the result.