**Covalesky v. Covalesky**

246

C.P. of Lackawanna County, No. 60069 of 2003

*Andrew J. Katsock, III*, for plaintiffs.
*John J. Brier*, for defendants.

MINORA, *J.*, September 10, 2013—

## INTRODUCTION

This case arises out of a dispute relative to farm deeds executed by Sylvester Covalesky ("Sylvester"), timber harvested from the farm premises, equipment purchased and used on the farm, and banking activity allegedly done by defendants Ruth Covalesky ("Ruth") and Philip Covalesky ("Philip"), her son, for Sylvester and his sister, Anne Covalesky ("Anne").

Sylvester and Anne filed a complaint against Ruth and Philip on October 15, 2003. Sylvester died on October 30, 2003. Plaintiffs thereafter filed an amended complaint on January 7, 2005, substituting Anne as executrix of the estate of Sylvester and adding Bernard Covalesky ("Bernard Jr.") as a plaintiff. Plaintiffs demand judgment against defendants, jointly and severally, plus interest and costs, together with such other and equitable relief the court may deem necessary and proper. Plaintiffs plead the following arguments with respect to the personal property and equipment from the farm, conveyance of the farm deeds, timber from the farm, funds in the accounts of Anne, Sylvester, and Ruth, and Sylvester's U.S. Savings Bonds.

## LEGAL ARGUMENT OF THE PLAINTIFFS

### I. Personal Property and Equipment from the Farm

Defendants should be ordered to account to Anne for all the equipment and personal property on the farm premises whether retained, sold, destroyed or otherwise disposed of by defendants. Judgment should be entered in favor of plaintiff and against defendants in an amount equal to the proceeds and/or the value of the equipment and other personal property retained, sold, otherwise disposed of or destroyed.

### II. Conveyance of the Farm Deeds

Sylvester's conveyance of the five (5) deeds to Anne and Philip were made under coercion and undue influence of defendants, therefore the deeds should be declared null and void. Defendants should be ordered to restore all the estate and premises in the deeds to plaintiff Anne, executrix of Sylvester's estate.

### III. Timbering on the Farm

Defendants should be ordered to account to plaintiffs for all timber cut, harvested and sold by defendants while defendants controlled the property. Defendants should also be ordered to pay the greater of the value of the trees or the dimunition of the value of the premises.

### IV. Grave Plot for Sylvester

Of the $1,500 Anne gave Ruth for the purchase of grave plots for Anne, Sylvester, and their brother Joseph Covalesky ("Joseph"), Ruth took the $1,500 and denied plaintiff the benefit of her purchase.

### V. Money Withdrawn from the Joint Checking Account of Sylvester, Anne and Ruth and the Joint Account of Ruth and Sylvester

Defendants gained access to bank and deposit accounts of Anne and Sylvester by duress, undue influence, or false pretenses.

VI. Sylvester's U.S. Savings Bonds Totaling Approximately $450,000

Defendants sold and liquidated approximately $450,000 of Sylvester's U.S. savings bonds at a substantial tax loss to Sylvester.

### FACTUAL AND PROCEDURAL HISTORY

A non-jury trial of the case was held on June 19 and 20, 2012. Upon conclusion of trial, the court requested the parties to produce records of medical treatment of Sylvester and the Pennsylvania State Police ("PSP") report of the alleged kidnapping of Sylvester on August 7, 2003. *See* trial transcript at 413. After numerous extensions of time by the court to accommodate counsel,[1] defendants produced Mercy Hospital and Allied records. Plaintiffs produced the Morristown Hospital records, but failed to produce the patient care records. The court finally insisted the record be closed. Findings of fact and conclusions of law were due thirty (30) days after March 21, 2013. *See* letter from Judge's Chambers Re: *Covalesky v. Covalesky*, 2003-CV-60069 (Mar. 21, 2013).

Defendants dispute plaintiffs' allegations. The court shall dispose of these dueling claims by virtue of its findings of fact and conclusions of law which are made pursuant to a non-jury trial wherein the parties entered testimony and exhibits in support of their respective

---

1. See order to provide a complete copy of all records for inpatient and outpatient treatment re: Sylvester Covalesky for the period from August 18, 2003 to October 30, 2003 (July 18, 2012); order granting plaintiff's motion to extend time to file findings of fact and conclusions of law (Aug. 16, 2012); order to release any and all medical records pertaining to the treatment of Sylvester Covalesky for the period of August through October 2003, *Covalesky v. Covalesky*, 2003-CV-60069 (Dec. 10, 2012).

positions and subsequent filings.

## FINDINGS OF FACT

In a non-jury proceeding, "assessments of credibility and conflicts in evidence are for the trial court to resolve." *Tailor v. Tailor*, 2010 WL 1779341 (Lacka. Co. 2010). The judge sits as the "finder of fact" and is free to believe all, some, or none of the testimony and/or evidence presented by any witness or party, and is also empowered to render decisions with respect to the probative value and evidentiary weight of the evidence submitted. *Commonwealth Financial Systems Inc. v. Hill*, 2010 WL 4814094, at *462 (Pa. Com. Pl. July 19, 2010); *Id*; *Tailor*, 2010 WL 1779341, *supra*; *Ruthrauff, Inc. v. Ravin, Inc.*, 914 A.2d 880, 888 (Pa. Super. 2006), *Runco v. Burdyn*, 2006 WL 2242995 at *1 (Lacka. Co. 2006). The findings of a trial judge in a non-jury case will be given the same weight and effect as a jury verdict and will not be disturbed absent error of law or abuse of discretion. *J.J. DeLuca Co., Inc. v. Toll Naval Associates*, 56 A.3d 402 (Pa. Super. 2012); *Rissi v. Cappella*, 918 A.2d 131 (Pa. Super. 2007).

The findings of fact as determined by the court are supported by the credible, probative, competent, and relevant evidence given weight by this court, and established during the non-jury proceedings and the evidentiary submissions of the parties. The findings are accepted as valid and true by this court.

I. Personal Property and Equipment from the Farm

1. Wesley Covalesky, Anne and Sylvester's father, died on February 29, 1956 and predeceased his wife, Veronica Covalesky, Anne and Sylvester's mother. Veronica devised the family farm by deed to her sons Joseph and Sylvester as joint tenants with right of survivorship, who continued to work on the farm until the death of Joseph. The farm contained approximately three hundred twenty

(320) acres. (*See* trial transcript 7-9, 12, 20)

2. Joseph died on or about March 7, 2001, which resulted in the farm passing by operation of law solely to Sylvester based on his rights as co-joint tenant with right of survivorship (*See* trial transcript 10:12-25, deposition of Anne Covalesky (July 31, 2007) at 32; plaintiff's exhibits #1,2,3,4, and 5)

3. Ruth, the sister-in-law of Anne, Sylvester, and Joseph, was married to Victor Covalesky, their brother. Victor predeceased Joseph (*See* trial transcript 12)

4. Neither Ruth nor her children Philip, Victor, and Barbara, visited the farm or assisted with farming until Joseph and Sylvester became elderly. (*See* trial transcript 11; 15:6-9; 307:8-11)

5. After Joseph died, Philip, Victor, Ruth, and Barbara were down at Sylvester and Anne's house on a daily basis. (*See* trial transcript 12:17-24, 304)

6. After Joseph died, Ruth helped facilitate Anne and Sylvester in paying their bills and Ruth and her family would get groceries and other household supplies. They were always compensated for these services. (*See* trial transcript 79; 122)

7. With Sylvester's permission, and as payment for Philip's work on the farm which included haying, farm chores, taking care of the cows, repairing things, and brush hogging to cut through fields, Philip used Sylvester's assets to purchase a brush hog ($1.868) and new tractor ($19,800). (*See* trial transcript 66:12-25, 307, 315-18, 326, 340; deposition of Anne Covalesky at 82-83; defendant's exhibit #12)

8. As of the date of the trial testimony, Philip was still using the brush hog and tractor. (*See* trial transcript at 349-50)

II. Conveyance of the Five Farm Deeds

9. Sylvester executed a durable power of attorney ("POA") appointing Anne as his attorney-in-fact, and Ruth as Anne's secondary successor. (*See* trial transcript 130, 132, 221, 223:9-10)

10. Ruth was to serve as the alternate POA only if Anne was deemed incapable. (*See* trial transcript at 133)

11. Attorney Brigid Carey, whose services were secured by Ruth, provided Sylvester with multiple drafts of the deeds conveying his interest in the family farm before the deeds were signed. (*See* trial transcript at 21, 187, 228, 232)

12. Ruth was present at all meetings attorney Carey had with Sylvester and Anne with respect to the farm deeds, and either Victor or Philip were also there. Whoever was at the house besides Anne and Sylvester was disengaged from the process of deed review and approval. (*See* trial transcript at 21; 183, 185-6, 303)

13. On or about May 16, 2001, Sylvester executed five (5) deeds, which conveyed the entire farm and farm house to Anne and Philip. (*See* trial transcript 16:3-4, 20:9-13, 25:22-23, 181)

14. Sylvester was 78 years old and suffered from severe Parkinson's disease at the time he executed the deeds. Sylvester's Parkinson's was advanced to the point he was unable sign his name. (*See* trial transcript 58:22, 24:5-7, 34:9-11)

15. All five (5) deeds were executed with an "X" that Sylvester made with assistance, by someone other than Anne. (*See* trial transcript 24, 33-34; 234)

16. Philip, Victor, Anne, and Ruth were present during

the execution of the deeds. (*See* trial transcript 16, 22:6-16)

17. Attorney Carey saw a pleasant, nuclear family relationship and nothing that would give her concern when the five deeds were signed. (*See* trial transcript at 235-36).

18. Attorney Carey said Sylvester expressed what he wanted done, she reviewed it with him again; and that he was bright, intelligent, present, engaged, listening, and following the conversation. (*See* trial transcript at 187).

19. Attorney Carey said that at no time did Anne, who was always engaged and spoke up, express anything other than that this was the way that Sylvester wished to proceed. (*See* trial transcript at 197; 199)

20. Sylvester signed a last will and testament on August 23, 2001, just about three (3) months after Sylvester executed the five farm deeds on May 16, 2001 wherein Anne and Philip were grantees as joint tenants with right of survivorship to each deed. In Sylvester's August 23, 2001 will, he made Anne and Philip joint tenants with right of survivorship to his estate, which was consistent with his conveyance regarding the five farm deeds. Attorney Carey drafted the will. Attorney Carey said Sylvester understood what he was doing when he made the will. (*See* trial transcript at 181, 189-91, 25:22-23 and defendant's exhibits #1)

21. The five deeds were signed in May 2001 and recorded in March of 2002. (*See* trail transcript 29:16, 30)

22. In a last will and testament of Sylvester made at a later date of August 21, 2003, drafted by attorney Henry P. Apryasz in New Jersey, Sylvester replaced his earlier will of August 23, 2001, and appointed Anne as executrix of his estate, and in the event Anne predeceased him, Sylvester gave his estate, real, personal, and mixed, to his nephew

Bernard Covalesky, Jr. In this last will and testament of Sylvester from August 21, 2003, Sylvester was mindful of his brother Andrew, his sister-in-law Ruth and her eight children, and specifically excluded them from the will. (Defendant's exhibit #4)

23. Sylvester made his final last will and testament (August 21, 2003) just days after coming home from Mercy Hospital and Allied Rehabilitation Center, where the medical reports state that Sylvester was mentally alert, able to make his needs known, and his mood was good, even though he had pressure ulcers, and was malnourished and weak. (*See* hospital reports, Aug. 7-18, 2003).

24. Anne Covalesky, like Sylvester, executed her last will and testament on August 21, 2003. Anne disposed of the residue of her estate to her nephew, Bernard Covalesky Jr., if he survives her. (*See* stipulations of fact regarding Anna B. Kavaliauskas' last will & testament at ¶¶3, 6 (filed July 22, 2013))

25. On October 31, 2003, the day after Sylvester died, Anne conveyed her one-half (1/2) interest in the five deeds relating to the family farm to her nephew, Bernard Covalesky Jr., by deed.

26. Bernard Jr. has survived Anne. Anne died December 28, 2012 subsequent to our hearing. (*See* stipulations of fact regarding Anna B. Kavaliauskas' last will and testament at ¶¶1 and 7)

27. Anne's will was not probated. *Id.* at ¶5.

III. Timbering on the Farm

28. Bernard Jr. was excluded from all aspects of the real property since his co-tenancy.[2]

_____

2. Although Philip Covalesky, Victor Covalesky, and attorney Brier admitted on the record during the July 19 & 20, 2012 non-jury trial that Philip owned the property with Bernard as tenants in common, and at-

29. Philip sold timber from the property for $14,883.25 without paying any proceeds to Bernard Jr.

30. Philip planned to use some of Bernard Jr.'s half of the proceeds to offset the alleged $6,095.33 worth of expenses Philip incurred on the property. The origin of these expenses nor their validity was ever proven or demonstrated to the satisfaction of the court. (*See* trial transcript at 329-30, 343)

31. Bernard Jr. did not authorize the expenses being incurred nor the timbering itself (*See* trial transcript at 331, 334-45)

32. On Philip's tax return for 2004, he listed gross income from farming as $14,883 and expenses of $6,253. Philip testified he is not entitled to the whole amount. (*See* defendant's exhibit #15; trial transcript at 333)

33. Philip stopped cutting timber after he got a letter that said cease and desist timbering. (*See* trial transcript at 333, 339)

IV. Grave Plot for Sylvester

34. When Joseph died, Anne gave Ruth $1,500 to purchase a grave plot for herself (Anne), Joseph, and Sylvester. Ruth purchased the grave plots in Ruth's name. To be buried in the plots, Sylvester needed to get permission from Ruth. (*See* trial transcript at 65; deposition of Anne Covalesky at 58)

---

torney Brier also admitted to this fact on page 30, paragraph 9, of his conclusions of law, attorney Brier completed a deed for Philip Covalesky in which Philip claims to be the sole owner of the Wyoming County parcels upon Anna's death, and conveys one-half of his mistaken, and wrongfully obtained, sole interest to his brother Victor. Currently, there is an action pending in Wyoming County to set aside this conveyance, and a hearing is scheduled for August 5, 2013. The court's dispositions in this case will have a definite effect on the ownership of the parcels in question, and on a pending case filed in Wyoming County. *See* stipulations of fact regarding Anna B. Kavaliauskas' last will & testament.

35. The plots actually cost Ruth $1,205. It is unclear how the remainder of the $1,500 Anne gave to Ruth for grave plots was spent. (*See* defendant's exhibit #9, deed between Ruth Covalesky and St. Joseph's Cemetery of Dalton, PA (dated Mar. 7, 2001); trial transcript at 73-74)

36. Joseph was buried at one of the plots. (*See* defendant's exhibit #9)

37. Anne did not seek permission from Ruth to bury Sylvester at the grave plot. Instead, she bought a plot for Sylvester when he died, for $500.00. (*See* trial transcript at 65-66, 74)

38. Ruth never returned the $1,500 for the three (3) grave plots to Anne. (*See* deposition of Anne Covalesky at 60)

V. Money Withdrawn from the Joint Checking Account of Sylvester, Anne and Ruth and the Joint Account of Ruth and Sylvester

39. After Joseph died, Ruth's name was added to the joint checking account 91-9016-0419 originally in the names of Anne, Sylvester, and Joseph ("PNC account") because Anne asked Ruth to go on it to handle her money (*See* trial transcript at 55, 88:13-16, 274-5, 55; deposition of Anne Covalesky at 61)

40. The account did not have checks, so Ruth transferred funds from that account into her personal checking account, and would then write checks from it for the benefit of Sylvester and Anne. Ruth never provided Anne or Sylvester any accounting, or statements for the account, but Ruth made her own ledger indicating where payments went. (*See* trial transcript 87:21-25, 88:1-2, 11-18, 275, 278; deposition of Anne Covalesky at 68; defendant's exhibit #10)

41. On March 20, 2003, Ruth withdrew $10,000 from

the PNC account for expenses for Anne and Sylvester. The money withdrawn by Ruth was used for expenses of Anne and Sylvester, consistent with trial testimony and Ruth's ledger. (*See* trial transcript pages 56-58, plaintiff's exhibit #7; defendant's exhibit #10; deposition of Anne Covalesky 63-64)

42. On April 9, 2003, $10,000 was withdrawn from the PNC account for expenses of Anne and Sylvester. The money withdrawn by Ruth was used for expenses of Anne and Sylvester, consistent with trial testimony and Ruth's ledger. (*See* trial transcript at 60, 277; deposition of Anne Covalesky at 65-67; plaintiff's exhibit #8; defendant's exhibit #10)

43. On or about July 1, 2003, Ruth withdrew another $10,000 from the PNC account for expenses of Anne and Sylvester, which Ruth deposited into her own savings account. The money withdrawn by Ruth was used for expenses of Anne and Sylvester, consistent with trial testimony and Ruth's ledger. (*See* trial transcript Pages 61-63; defendants exhibits #9, 11; deposition of Anne Covalesky at 14-15)

44. On July 25, 2003, Ruth withdrew $500 from the MAC account that was in the names of Sylvester and Ruth ending in "2636." This account had Ruth's social security number on it. (*See* trial transcript 63:15-25; plaintiff's exhibit #10)

VI. Sylvester's U.S. Savings Bonds Totaling Approximately $450,000

45. Ruth came to Anne and the advice at the time was that Ruth should keep possession of the stacks of U.S. Savings Bonds of Sylvester, for safe keeping. (*See* trial transcript at 134, 137, 280; deposition of Anne Covalesky at 107)

46. On August 7, 2003, Ruth took Sylvester to the hospital and told Sylvester that she still had his bonds, but could not pay for all his medical expenses. That day, Ruth liquidated approximately $450,000 of Sylvester's bonds and placed them in an account ending in "2619," titled in her name and Sylvester's, with Ruth's social security number. The "2619" account is not the same account as the MAC account in Ruth and Sylvester's name referenced in paragraph 44 of this opinion from which Ruth made a $500 withdrawal. (*See* trial transcript at 49, 285; deposition of Anne Covalesky at 62; plaintiff's exhibit #11, defendant's exhibit #17)

47. Ruth testified that Sylvester told her to cash the bonds while, when he was at her house after being taken by Ruth's family from the farm and before going to the hospital, Ruth informed him she could not pay for his care but she had his bonds. (*See* trial transcript at 285). Sylvester's alleged consent is a self-serving statement made by Ruth, and rejected by the court as not credible.

48. Because Ruth liquidated approximately $450,000 of Sylvester's savings bonds at once, Sylvester paid a tax of nearly $90,000 ($89, 691) according to the tax record. (*See* trial transcript at 254-50, 137; deposition of Anne Covalesky at 54-55)

49. Ruth illegally acted as Sylvester's attorney-in-fact when she cashed approximately $450,000 of Sylvester's bonds all at once, because at the time, Anne was Sylvester's primary and principal attorney in fact and Anne was not determined incapable to serve. *See* trial transcript at 49 & 50, 130, 285, 301-2).

50. Attorney Douglas P. Thomas learned from PNC Bank personnel that approximately $450,000 worth of bonds had been liquidated, and he also found that an account with Ruth and Sylvester's name on it had

approximately the value of Sylvester's bonds that were missing. (*See* trial transcript at 135)

51. Attorney Thomas recovered the money from Sylvester's U.S. Savings Bonds that was liquidated into the "2619" account of Ruth and Sylvester and testified that ultimately the money was returned to Sylvester. (*See* trial transcript at 48-50; 135-36; dep. of Anne Covalesky at 54)

52. To get Sylvester's bond money back, Anne used her POA for Sylvester to execute check on October 21, 2003 for $353,500 from the "2619" account in Ruth and Sylvester names since this was the account in which the bond money was deposited. Anne also executed a cashier's check of $25,000 from that account, and another check was withdrawn on October 23, 2003 from the account by Susan Savaiko, Anne and Sylvester's niece, as POA, for $102,222. (*See* trial transcript at 96-97, 254-56, defendant's exhibit #17).

53. Thereafter, $1,000 was deposited into a new account in New Jersey PNC Bank account "0198" for Anne Covalesky on October 21, 2003, $329,164.02 was deposited into the same account on October 22, 2003, and $102,222.68 was deposited into the account on October 23, 2003. The $25,000 was credited to Anne Covalesky in a New Jersey PNC Bank account on October 22, 2003. (Defendant's exhibit #17). The sum of the deposits of $329,164.02, $102,222.68, $25,000, and $1,000 to Anne's name totals $457,386.70, which reflects that the approximately $450,000 in Sylvester's savings bonds that were illegally liquidated by Ruth was recovered by Anne as Sylvester's POA.

54. Anne said she spent the money over the intervening years (*See* trial transcript at 97) and we find that to be credible.

55. Sylvester Covalesky died on October 30, 2003.

56. Sylvester's will was probated in Lackawanna County on December 10, 2003.

## CONCLUSIONS OF LAW

I. Personal Property and Equipment from the Farm

1. "When it appears that by an inter vivos transaction, [a person] has obtained a gift or other benefit from his confidant, he must...prove affirmatively that it is unaffected by any taint of undue influence, imposition, or deception. *McCown v. Fraser*, 327 Pa. 561, 565 (citing *Stepp v. Frampton*, 179 Pa. 284, 36 A. 177).

2. Victor and Philip performed work on the farm for Sylvester after Joseph passed away and they were compensated for their haying, farm chores, repairing, and brush hogging.

3. The brush hog and tractor that Philip purchased with Sylvester's money were inter-vivos gifts to Philip as additional compensation for this work performed on the farm. Therefore we determine that Philip is the rightful owner of the brush hog and tractor.

II. Conveyance of the Five Farm Deeds

4. There is a presumption of lack of undue influence, and the proponent can shift the onus of going forward by proving "(1) a person in a confidential relationship (2) receives the bulk of the testator's property (3) from a testator of weakened intellect." *In re Clark's Estate*, 461 Pa. 52, 59-60 (1975).

5. "No clearer indication of a confidential relationship [can] exist than giving another person the power of attorney over one's entire life savings. This is particularly true when the alleged donee is shown to have spent a great deal of time with the decedent or assisted in decedent's

care. *Estate of Lakatosh*, 441 Pa. Super. 133, 142 (Pa. Super. 1995).

6. Ruth Covalesky was the secondary successor agent on Sylvester's POA, and acted as if she was the current attorney-in-fact for Sylvester. This establishes her confidential relationship with Sylvester.

7. Ruth was on a joint account with Anne and Sylvester, paid all of Anne and Sylvester's bills and handled their banking needs. This also establishes Ruth's confidential relationship with Sylvester.

8. Ruth was given Sylvester's bonds worth approximately $450,000 to hold for safe keeping before Ruth illegally liquidated all of the bonds into an account with her name and Sylvester's on or about August 7, 2003. Ruth's holding the bonds also establishes Ruth's confidential relationship with Sylvester.

9. Before the burden shifts for the proponent to prove that there was no undue influence, the contestant must satisfy all three elements of the undue influence test. *Estate of Simpson*, 407 Pa.Super. 1, 9, 595 A.2d 94, 98 (1991).

10. The second element of the undue influence test, "weakened intellect," has been defined as as a mind which, in all the circumstances of a particular situation, is inferior to normal minds in reasoning, power, factual knowledge, freedom of thought and decision, and other characteristics of a fully competent mentality. *In re Estate of DiCesare*, 2003 WL 2205336, at *8-9 (Pa. Com. Pl. 2003).

11. Sylvester, though physically ill, did not have a weakened intellect at the signing of the deeds, according to recent hospital records and attorney Carey. Therefore we find this confirmed observation credible.

12. Attorney Carey visited Sylvester on multiple occasions and provided him with drafts of the documents

conveying the five deeds before Sylvester signed them.

13. Because of his Parkinson's, Sylvester was unable to sign the deeds therefore he chose to make his own mark on the five deeds conveying the property to Anne and Philip, and he was assisted by someone present at the deed signing. This represents a series of five legally valid conveyances.

14. Sylvester was alert when he provided joint tenancy with right of survivorship to Anne and Philip in his August 23, 2001 will, just about two months after he conveyed the deeds to Anne and Philip on or about May 16, 2001.

15. The deeds were valid and were not executed subject to any undue influence over Sylvester.

III. Timbering on the Farm

16. Upon severance of the joint tenancy, the realty becomes a tenancy in common. *McArthur v. Dept. of Public Welfare*, 674 A.2d 779 (Pa. Cmwlth. 1996).

17. A 'right of survivorship' is not associated with a tenancy in common. *Edel v. Edel*, 283 Pa.Super. 551, 424 A.2d 946, 949-50 (Pa. Super. 1981).

18. With a tenancy in common, each tenant is entitled to a one-half interest in sale proceeds. *McArthur*, 674 A.2d at 781.

19. Bernard Jr., who received Anne's interest by deed conveyance inter vivos, as a tenant in common with Philip, is entitled to his ½ interest in the proceeds from the timbering on the farm premises.

20. Bernard Jr., who received Anne's interest by deed conveyance inter vivos, as co-tenant, is entitled to ½ of the 2004 income tax farm profits.

21. With a tenancy in common where one tenant has

not shared the proceeds with the other joint tenant, [the tenant with the proceeds] shall file an accounting setting forth the sales of all...timber...and the disposition of the proceeds of such sales in the office of the prothonotary. *Blankley v. Blankley*, 42 Pa. D. & C.3d 494, 1985 WL 48175 (Pa. Com.Pl. Aug. 9, 1985).

22. It [is] unlawful for any owner or owners of any undivided interest in timber land to cut, remove, or cause to be cut or removed, any timber trees, without first obtaining the written consent of all co-tenants in said premises. Plaintiff could recover damages from defendant who had cut down a line tree unilaterally without the consent of his co-tenant. *Wolfinger v. Moats*, 1990 WL 303089 (Pa. Com. Pl. 1990) (internal citations omitted).

23. Generally, timbering, which severs an asset from the land converting it to personalty diminishes the value of the real property where it was previously affixed. *See generally Zitney v. Appalachian Timber Products, Inc.*, 2013 WL 3366740 (Pa. Super. 2013); *Com. v. Meinhart*, 173 Pa.Super. 495, 98 A.2d 392 (Pa. Super. 1953) (timber severed from land is converted to personalty); *Christian v. Yanoviak*, 945 A.2d 220 (Pa. Super. 2008); *Blankley v. Blankley*, 42 Pa. D. & C.3d 494, 1985 WL 48175 (Pa.Com.Pl. 1985) (property's value would diminish if defendant did not stop timbering). No such diminished value evidence was offered in our case.

24. Bernard. Jr. should recover damages from Philip for Philip having timbered the property without Bernard Jr.'s authorization.

25. A tenant in common is not liable to his co-tenants by an amount expended on an improvement of joint property if the co-tenant did not agree to such improvement. *Dennis v. Doran*, 2002 WL 34097619 (Ct. Com. Pl. Aug. 11, 2002); *Chesney v. Stevens*, 435 Pa.Super. 71, 644 A.2d

1240 (Pa. Super. 1994). Since it was never proven that the co-tenant in common Bernard Jr. authorized the expenses, he is not liable to Philip for them. Bernard Jr. is entitled to one half (1/2) of the gross proceeds of the timber sold since that is the only measure of damages proven to the court without any reduction for the unauthorized expenses incurred by Philip.

IV. Grave Plot for Sylvester

26. Anne never asked Ruth for permission to use Sylvester's grave plot.

27. Bernard Jr., on behalf of Anne's estate,[3] is entitled to recover title to the grave plot and $500.00 for the plot that Anne purchased for Sylvester.

28. Although Anne's will has not yet been probated, whether the laws of Pennsylvania or New Jersey govern Anne's will, the fact that Anne's Will has not yet been probated does not prevent Anne's estate taking her residue in Sylvester's estate pursuant to Sylvester's will as referenced in this opinion.

29. Pennsylvania law with respect to the time within which a will may be probated, 20 Pa.C.S.A. §3133, states that "a will may be probated at any time." New Jersey law regarding the time for probate of a written will, includes a time bar only stating, in N.J.S.A. 3A:3-19, that "no will shall be admitted to probate until after 10 days from the death of the testator."[4] Since Anne died, after our hearing

_____

3. Anne's last will and testament provides that Bernard Covalesky Jr. take her estate.

4. Since Anne's last will and testament was executed in New Jersey and as of the time of trial testimony Anne was living in New Jersey, Anne is believed to have died in New Jersey. New Jersey law regarding probation of wills for residents states that N.J.S.A. 3A:3-18, "Where a will of a resident is to be probated," states that The will of any person resident within any county of this state at his death may be admitted to probate in the surrogate's court of the county or in the Superior Court.

on December 28, 2012, the 10 day period has since passed.

V. Money Withdrawn from Joint Account of Sylvester, Ruth, and Anne and from the Account of Ruth and Sylvester

30. Trial and deposition testimony and exhibits including exhibit #10, Ruth's ledger, indicate that each of the three (3) $10,000 withdrawals from the joint PNC account made by Ruth in March, April, and July 2003 were spent for the benefit of Anne and Sylvester.

31. The eventual whereabouts of the $500 MAC withdrawal is unclear.

32. The PNC account and MAC withdrawals were not made due to the weakened intellect of Sylvester or Anne, therefore were not made with undue influence. The claim that defendants gained access to Anne and Sylvester's bank and deposit accounts by duress, undue influence and false pretenses is not sufficiently proven to the court's satisfaction and is provided no relief.

33. "Joint Account" means an account payable on request to one or more of two or more parties whether or not mention is made of any right of survivorship.

34. 20 Pa.C.S.A. Section 6303(a) states that a "joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sum on deposit, unless there is clear and convincing evidence of a different intent." *Siler v. Wolfe*, 2006 WL

---

If the will of any person resident within the state at his death is probated without the state, it shall be without effect unless or until probate is granted within the State. New Jersey Law 3A:3-27, "Probate of will of nonresident probated in another state or country," states that when the will of any person not resident in this State at his death shall have been admitted to probate in any state of the United States or other jurisdiction or country, the surrogate's court of any county may admit it to probate for any purpose and issue letters thereon, provided the will is valid under the laws of this State.

3830199 (trial order) (Ct. Com. Pl. Jan. 12, 2006).

35. Any sum remaining on deposit at the death of a party to a joint account belongs to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intent at the time the account is created. 20 Pa. C.S.A. §6304; *In re Estate of Piet*, 949 A.2d 886 (Pa. Super. 2008). *See also* Official Advisory Committee Comment to 20 Pa. C.S.A. §6304.

36. If a decedent places assets in a joint account and then executes a will, decedent did so recognizing decedent had already diminished her estate by creating the joint account. *In re Estate of Piet*, 949 A.2d 886 (Pa. Super. 2008).

37. A will executed after the joint account is made does not affect the survivorship rights of parties to the pre-existing joint account. 20 Pa. C.S.A. 6304(d).

38. Even though Sylvester's Last will and testament excluded Ruth and her children from his estate, Ruth, as the last survivor from the MAC account in the names of Ruth and Sylvester, would have the remainder of the $500 withdrawal from the MAC account, if any is determined to exist.

VI. Sylvester's U.S. Savings Bonds Totaling Approximately $450,000

39. In *In re Houck*, 2010 WL 7155339 (Ct. Com. Pl. Orphan's Ct. June 30, 2010), the court found that when Ms. Walker, who Edna Houck had selected to be her power-of-attorney, endorsed and deposited eight (8) checks of over $13,000 payable to Houck into Walker's personal bank account, Walker's claim of having deposited the money into her own account for the benefit of Houck was "incredible." In addition, the court held that since

the power of attorney under which Walker was acting was invalid due to document flaws, when Ms. Walker misappropriated the funds, Ms. Walker had no authority to act as power-of-attorney, and therefore the deposits into Ms. Walker's account were invalid. The court surcharged Walker for the amount she misappropriated.

40. Ruth illegally and improperly used Anne's POA for Sylvester when Ruth cashed approximately $450,000 of Sylvester's U.S. savings bonds and placed the money in an account in Ruth's name and Sylvester's, since Ruth had no authority to act as power-of-attorney for Sylvester. Ruth was secondary successor attorney-in-fact for Sylvester only in the event that Anne was unable to serve, and Anne was capable of serving. Ruth's liquidation of the bonds while improperly acting as Sylvester's power-of-attorney was invalid.

41. In liquidating approximately $450,000 of Sylvester's savings bonds at once and placing the money into an account in Ruth and Sylvester's names, Ruth illegally converted Sylvester's U.S. savings bonds.

42. Conversion is defined as "the deprivation of another's right of property, in or use or possession of, a chattel without the owner's consent and without lawful justification." *Siler v. Wolfe*, 2006 WL 3830198 (Pa. Com. Pl. Jan. 12, 2006).

43. Ruth's testimony that Sylvester told her to cash the bonds when he was on his way to the hospital and Ruth informed him she could not pay for his medical care, was determined in our finding of facts to be a self serving comment by Ruth and was rejected as unworthy of belief. Therefore this illustrates that Sylvester did not give his consent to Ruth nor authorize Ruth's cashing Sylvester's bonds.

44. Ruth's claim that the bonds were liquidated for

Sylvester's medical expenses when Sylvester had not yet even incurred any such expenses since he was on his way to the hospital when Ruth asked him about cashing the bonds, is found to be incredible and unconvincing.

45. When Attorney Thomas intervened to make certain that the money from Sylvester's bonds be returned to Sylvester, Anne properly used her POA for Sylvester when Anne executed the checks for $353,500 and $25,000 from the "2619" account (account in Ruth and Sylvester's name), and Susan Savaiko executed her POA to execute a check for $102,222.68. In thereafter depositing the sums of $329,164.02, $102,222.68, $25,000, and $1,000, into the New Jersey account in Anne's name, Sylvester's bond money was rightfully returned to Sylvester. (*See* defendant's exhibit #17).

46. While it is unclear where the bond money was placed once recovered by Anne and Susan on behalf of Sylvester, Ruth is not entitled to any remainder of the money if such remainder exists. This is due to Ruth having illegally and improperly acted as Sylvester's power-of-attorney when she liquidated Sylvester's bonds and converted them.

47. Since Sylvester's last will and testament dated August 21, 2003 lists Anne as executrix of his estate and excludes Ruth and her children, recovery of the bond money in October 2003 in checks payable to Susan and Anne, attorney-in-fact for Sylvester, with no portion returned to Ruth, reflects Sylvester's wishes.

48. Additionally, Ruth must return all of the $89,691 tax loss Sylvester incurred when Ruth illegally liquidated Sylvester's U.S. savings bonds without authorization or power of attorney, to the estate of Sylvester (which, pursuant to Sylvester's last will and testament, is the estate of Anne[5]).

_____

5. As stated above, Anne's will is not yet probated, however ac-

Non-Jury Verdict and Disposition of Relief

In accordance with the above findings of fact and conclusions of law, we issue a non-jury verdict as follows:

I. Personal Property and Equipment from the Farm

1. The tractor and brush hog were gifts from Sylvester Covalesky to Philip Covalesky for Philip's work on the farm.

2. The tractor and brush hog are not part of Sylvester Covalesky's estate.

II. Farm Deeds

1. The five farm deeds are valid conveyances and not the product of undue influence.

2. The farm deeds are not part of Sylvester Covalesky's estate.

3. Philip and Bernard Jr. have a tenancy in common in all five of the farm deeds.

III. Timbering from the Farm

1. Bernard Jr. is entitled to 50% of the gross proceeds of all timber cut, harvested and sold or 50% of the gross amount that Philip claimed on his 2004 tax return. This is to be paid without any set off for the unauthorized expense incurred in the unauthorized timbering.

IV. Grave Plots for Sylvester

1. Bernard Jr., on behalf of Anne, is entitled to recover title to the grave plot originally intended for Sylvester's use that was purchased with Sylvester's money.

---

cording to Pennsylvania and New Jersey law, her Will can still be probated. 20 Pa. C.S.A. 3813 states that a will may be probated at any time, and under New Jersey law, a will may be probated ten (10) days after decedent's death.

2. Bernard Jr., on behalf of Anne's estate, is also entitled to $500.00 for the grave plot Anne took out and used for Sylvester at his death.

V. Money Withdrawn from Joint Account of Sylvester, Ruth, and Anne and from the Account of Ruth and Sylvester

1. The three (3) $10,000 withdrawals made by Ruth from the joint PNC account in March, April, and July 2003 were spent for the benefit of Anne and Sylvester, as indicated in trial and deposition testimony and in trial exhibits including Ruth's ledger. Therefore the withdrawals are accounted for, were not made by duress, undue influences or false pretenses, and do not need judicial relief.

2. Any of the $500 withdrawn by Ruth from the MAC account still remaining, if any is determined to exist, belongs to Ruth pursuant to her survivorship rights under 20 Pa.C.S.A. Section 6304(a).

VI. Sylvester's U.S. Savings Bonds Totaling Approximately $450,000

1. Anne was able to serve as power of attorney for Sylvester, as she was not determined to be legally incapable.

2. Any amount remaining of the approximately $450,000 worth of the bonds, if any is determined to exist, belongs to Sylvester's estate (and therefore Anne's estate, since Sylvester's last will and testament provided for Anne to be executrix of his estate). Ruth should not get any of Sylvester's bond money remaining if any, because Ruth illegally, improperly and invalidly used Anne's power of attorney for Sylvester when Ruth illegally liquidated all of Sylvester's bonds, nor was Ruth a named beneficiary of either Sylvester's nor Anne's wills.

3. Ruth must return all of the $89,691 tax loss that

Sylvester incurred when Ruth illegally liquidated his bonds, to the estate of Sylvester. Pursuant to the terms of Sylvester's last will and testament, any amount would therefore go to the estate of Anne.

## ORDER

And now, this 6th day of September, 2013, after conducting a non-jury trial relative to the above-caption matter and upon consideration of all the evidence, testimonial and by exhibits and also after receipt and consideration of the parties' respective trial submissions and stipulations, this court finds the following:

I. Personal Property and Equipment from the Farm

1. The tractor and brush hog were gifts from Sylvester Covalesky to Philip Covalesky for Philip's work on the farm.

2. The tractor and brush hog are not part of Sylvester Covalesky's estate.

II. Farm Deeds

1. The five farm deeds are valid conveyances and not the product of undue influence.

2. The farm deeds are not part of Sylvester Covalesky's estate.

3. Philip and Bernard Jr. have a tenancy in common in all five of the farm deeds.

III. Timbering from the Farm

1. Bernard Jr. is entitled to 50% of the gross proceeds of all timber cut, harvested and sold or 50% of the gross amount that Philip claimed on his 2004 tax return. This is to be paid without any set off for the unauthorized expenses incurred in carrying out the unauthorized timbering.

2. Philip is ordered to submit the proceeds to the office of the prothonotary or to opposing counsel as attorney for Bernard Jr.

IV. Grave Plots for Sylvester

1. Bernard Jr., on behalf of Anne, is entitled to recover title to the grave plot originally intended for Sylvester's use that was purchased with Sylvester's money.

2. Bernard Jr., on behalf of Anne's estate, is also entitled to $500.00 for the grave plot Anne took out and used for Sylvester at his death.

V. Money Withdrawn from Joint Account of Sylvester, Ruth, and Anne and from the Account of Ruth and Sylvester

1. The three (3) $10,000 withdrawals made by Ruth from the joint PNC account in March, April, and July 2003 were spent for the benefit of Anne and Sylvester, as indicated in trial and deposition testimony, and in trial exhibits including Ruth's ledger. Therefore the withdrawals are accounted for, were not made due to duress, undue influence, or false pretenses, and do not need to be recovered.

2. Any of the $500 withdrawn by Ruth from the MAC account still remaining, if any is determined to exist, belongs to Ruth pursuant to her survivorship rights under 20 Pa.C.S.A. section 6304(a).

VII. Sylvester's U.S. Savings Bonds Totaling Approximately $450,000

4. Any remaining sum from the approximately $450,000 worth of the bonds, if any is determined to exist, belongs to Sylvester's estate. By the terms of Sylvester's will, any amount remaining is directed to the estate of Anne.

5. Ruth must return all of the $89,691 tax loss that

Sylvester incurred when Ruth illegally liquidated his bonds, to the estate of Sylvester. Pursuant to the terms of Sylvester's last will and testament, any amount would therefore go to the estate of Anne.